[No. G043778. Fourth Dist., Div. Three. May 31, 2011.]

SUSAN McGILL, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Kevin E. Gallagher for Petitioner.

No appearance for Respondent.

Tony Rackauckas, District Attorney, and Stephan Sauer, Deputy District Attorney, for Real Party in Interest.

**OPINION**

**SILLS, P. J.—**

## I. SUMMARY

In mid-August 2006, the Orange County District Attorney's Office convened a grand jury investigation into possible misuse of public funds by the superintendent of the Capistrano Unified School District, James Fleming. (See generally *Fleming v. Superior Court* (2010) 191 Cal.App.4th 73 [119 Cal.Rptr.3d 275] (*Fleming*).) The district attorney's office's theory was that the school superintendent had misused public resources by authorizing subordinates to compile lists of individuals who had supported a recall of the school district's board of trustees in 2005. (*Id.* at p. 77.)

One of those subordinates was Susan McGill, the assistant superintendent of the school district until she retired in June 2006, just months before the grand jury began its investigation in August. McGill's specific role in the alleged misappropriation was, according to the district attorney's office, this: Superintendent Fleming sent assistant superintendent McGill, along with the

school district's public relations officer, David Smollar, down to the county registrar of voters to look at the various recall petitions that had been turned in, and to copy down names of recall supporters. Afterwards, McGill had her secretary create a spreadsheet of recall supporters using a school district database, and later the lists were forwarded to Fleming. (*Fleming, supra*, 191 Cal.App.4th at p. 80.)

The grand jury's investigation began in August of 2006, and was not completed until May 2007, roughly nine months later. Fourteen witnesses appeared before the grand jury in that nine-month period, including Fleming, the target of the investigation. However, Fleming, knowing he was the target of the grand jury's investigation, invoked his privilege against self-incrimination to most of the questions asked of him.

McGill was among the very first witnesses to testify, testifying relatively early in the process in mid-August 2006, right after the testimony of Kate McIntyre, who had been Fleming's personal secretary. McGill was *not* the "target" of the grand jury's investigation. In fact, she was specifically told at the beginning of her testimony that there was "no expectation or intention" at that time of any charges against her "as a result" of the investigation.

But McGill's testimony did not fit the district attorney's office's version of events: McGill testified that going down to the registrar's office was her own idea, because she anticipated a lawsuit against the school district, and she wanted to know why some signatures were valid and some weren't. She also said that Smollar had "asked to come along," and said Smollar practically inserted himself into the trip, which made her feel uncomfortable. In fact, McGill testified to a certain amount of enmity which Smollar bore her, a point that Fleming's secretary, McIntyre, had also made earlier. Basically, according to McGill, Smollar was angry that he didn't get the job of being the school district's "point person" in regard to the recall movement. Smollar had even "verbally attacked" McGill.

There was no dispute in the grand jury testimony that McGill and Smollar went down together to the registrar's office, where names of signature-gatherers were copied down. As McGill recounted events, she would read out names from the petitions and Smollar wrote them down. According to McGill, they hadn't been told to do that by Fleming; it was their own idea. While McGill said that she *had informed* Fleming about the trip and recall procedures, she "never gave" any "report about the names" to Fleming. Rather, she had assumed that Smollar was probably going to handle the matter with Fleming.

McGill's last day of testimony was August 21, 2006. Within a month, a document, dated January 12, 2006, was found among *Smollar's* "things." (Smollar himself had left the school district about June 2006.) The document was a list of the signature-gatherers, with a cover sheet in the form of a short memo, ostensibly from McGill to Fleming, and no "cc" to Smollar, consisting of two sentences, basically saying, "per your request, here's a list of signature-gatherers."[1]

McGill was never asked to return to the grand jury to explain the memo, or given the chance to allow it to refresh her memory of the events concerning the trip to the registrar's office. However, in May 2007, nine months after McGill testified, McGill's own secretary, Barbara Thacker, was called to testify before the same grand jury (still ostensibly investigating *Fleming*). We will describe Thacker's questioning and testimony in extreme detail in part III. of this opinion, but for the moment here is a précis: Thacker could not recall that McGill ever gave her the memo to type up, but—after being asked substantively the same question over and over (and over and over) again by two separate deputy district attorneys each taking turns asking that same question—Thacker said that McGill had *probably* given her the memo to prepare.

As noted, initially McGill was not only *not* the target of the grand jury's investigation, but she was specifically told there was no expectation of any charges against her from the proceeding, which was focused on Fleming. Even so, at the close of the investigation in May 2007, the two trial-level deputy district attorneys conducting the investigation not only asked for an indictment of Fleming, on three counts, but for an indictment of *McGill*, on two counts, as well.

One of those counts was *intrinsic* to the grand jury proceeding itself, that is, based on alleged perjury before the grand jury in conducting the investigation of Fleming. We should point out now that what exactly McGill was alleged to have falsely told the grand jury under oath is not spelled out in the

---

[1] The cover page of that memo is so short that we now quote it in full, except that readers should note there is a mark, perhaps better described as a checkmark-like squiggle, right after the word "Services":

"TO: James A. Fleming, Superintendent

"FROM: Susan McGill, Assistant Superintendent, Administrative Services* [(the asterisk represents the squiggle)]

"SUBJECT: LIST OF SIGNATURES ON PETITIONS

"Per your request, attached are the lists of individuals who were listed as petition signature-gatherers along with the information on whether they have children in CUSD and which schools those children attend.

"I am available to answer any questions you may have."

indictment. All the indictment tells McGill is that she was alleged to have lied somehow, somewhere, in her grand jury testimony. Literally, the indictment said no more than that.[2]

Indeed, *to this day* in 2011, the district attorney's office has *yet* to actually *quote the exact words* which McGill uttered under oath and which the office claims she knew were false. Instead, the district attorney's office has provided, in briefing to this court, a series of general statements in the district attorney's office's own words that paraphrase McGill's testimony, followed by a string of general record references: "Petitioner further testified she did not know what happened to the list of names Smollar had written down. (RT: 191, 205–208.) She repeatedly claimed she never told Superintendent James Fleming about the list or wrote him any memos about it. (RT: 189–190, 195, 201, 202–203, 205–208, 212.)"[3]

From this statement, we gather that the district attorney's office has based its perjury count on the January 12, 2006 cover memo, ostensibly written by McGill, and its subsequent "authentication" by her erstwhile secretary, Thacker. The district attorney's office's theory appears to be that McGill falsely testified that she did not know what happened to the list of names written down at the registrar's office. and did not give Fleming any memos about the trip when, in fact, the January 12, 2006 cover memo proves she did know full well what happened to the list, and in fact did write Fleming a memo about the list.

The other count in the indictment was *extrinsic* to McGill's testimony, that is, did not depend on the face of McGill's testimony before the grand jury,

---

[2] Here is the perjury count as entirely set forth in the indictment:
"Count 4:
"On and between August 16, 2006 and August 21, 2006, in violation of section 118(a) of the Penal Code (PERJURY), a FELONY, SUSAN MCGILL, having taken an oath under penalty of perjury to testify truthfully before a Grand Jury, did willfully and unlawfully state as true any material matter which she knew to be false."

[3] The quotation is taken from page 11 of the district attorney's office's return, filed September 9, 2010, to McGill's petition for writ of mandate.

A similar statement—that is, based on a general paraphrase followed with a string of record references—was made in a supplemental briefing filed on January 28, 2011, by the district attorney's office: "Moreover, McGill's perjury charge is not founded upon her participation in writing down the names of the petition signature gatherers at the Registrar's Office. Rather, the perjury charge is based upon her testimony that she did not know what happened to the lists of names Smollar had written down and her repeated denials that she ever told Fleming about the lists or wrote him any memos against them. (Reporter's transcript of the grand jury proceeding at pp. 189–191, 195, 201, 202–203, 205–208, 212.)"

In part III. of this opinion, we will cover in extreme detail everything on each of the pages cited by the district attorney's office, including quoting the actual testimony instead of the district attorney's office's paraphrase.

except insofar perhaps as the count was premised on a rejection of McGill's testimony that going down to the registrar's office was her own idea. This was a conspiracy count, which McGill shared with Fleming. The conspiracy allegation, as it was eventually fleshed out in briefing at the appellate level, was based on the theory that McGill and Fleming conspired to " 'use district resources to further their own personal purposes.' " (*Fleming, supra*, 191 Cal.App.4th at p. 100, fn. 24 [quoting district attorney's office's brief].) This court affirmed the trial court's dismissal of the conspiracy count in *Fleming*, and that judgment is now final.

But what about the school district's public relations officer Smollar, who by every version of the facts was at least as involved in the trip to the registrar's office and the preparation of the list as McGill, and in whose own "things" the memo, ostensibly from McGill, had been found? Smollar was never called to testify before the grand jury.

But there was something more than just the fact that Smollar was never called: At the very end of the grand jury's investigation in mid-May, one of the deputy district attorneys presenting the witnesses to the grand jury affirmatively instructed the grand jury that "anything" Smollar "might or might not say" was "irrelevant" to the "crimes" which the grand jury was being asked to consider, which included the perjury charge against McGill.

The indictment against superintendent Fleming (including necessarily the conspiracy count against both Fleming and McGill) was considered in *Fleming, supra*, 191 Cal.App.4th 73. There, this court held that, under the Education Code, the superintendent and his assistant McGill were within their lawful authority to compile the lists, disposing of the first two counts against Fleming. (See *id.* at pp. 84–89 [noting and then applying provisions of Ed. Code, §§ 35020, 35172, 35293 & 42130].) This court affirmed the trial court's dismissal of the conspiracy count against Fleming and McGill (count 3), since there was insufficient evidence that Fleming and McGill had done "anything that even remotely" resembled obstruction of justice or the due administration of the laws. (*Fleming, supra*, 191 Cal.App.4th at p. 100.)

The dismissal of all the counts against Fleming and the conspiracy count against McGill leaves only the perjury count against McGill, which is the subject of this writ proceeding, brought by McGill after the trial court denied her motion to dismiss the indictment pursuant to section 995 of the Penal Code.[4] After oral argument and no less than three rounds of supplemental briefing requested by this court, here are our conclusions:

---

[4] A general overview of the litigation history of the various counts goes like this: An indictment was filed against Fleming and McGill, containing four counts: count 1 against Fleming only (violation of Pen. Code, § 424 [misuse of public funds]), count 2 against Fleming only (violation of Ed. Code, § 7050 [using school funds for electioneering]), count 3 against

(1) As explained in detail in part VI.A. of this opinion, a district attorney's office cannot limit its duties in dealing with the grand jury to simply refraining from *not disclosing* evidence which it knows to be exculpatory. A district attorney's office must also not, even if unintentionally, cause a grand jury to think that it would not be worth its while to call a given witness when that witness's testimony is clearly relevant to the charges being considered. The district attorney's office here may have acted with good intentions in not calling Smollar to testify and in telling the grand jury that anything he even "might" say was irrelevant, but those good intentions still had the unfortunate effect of interfering with the grand jury's independence. And that independence is absolutely foundational to the grand jury's role in criminal cases (as well as, we might add, the grand jury's civil watchdog function).

The grand jury had the *right* to request a judge to issue a subpoena to have Smollar examined. (Pen. Code, § 939.2.) The grand jury had the *duty* to make its *own* credibility determination as to whether McGill really had *knowingly* lied before handing down its indictment, and Smollar's testimony would have undoubtedly helped that credibility determination. (*Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, 498 [57 Cal.Rptr.3d 170] (*Berardi*) ["The grand jury, like the magistrate, is called upon to make credibility resolutions and weigh the evidence when determining probable cause."].)

(2) The grand jury's own failure to recall McGill to "explain"—and that's the key statutory word—the January 12, 2006 memo was, on the peculiar facts of this record, a violation of Penal Code section 939.7, resulting in substantial prejudice to McGill.[5] Under the terms of section 939.7, a grand jury has an affirmative duty to order the production of evidence within its reach when it has reason to believe that such evidence will "explain away" the charge.[6] Here, the grand jury had ample reason to believe that calling McGill back to get her explanation about the memo would have explained

---

Fleming and McGill (violation of Pen. Code, § 182, subd. (a)(5) [conspiracy]), and count 4 against McGill only (violation of Pen. Code, § 118 [perjury]). In the face of challenges brought pursuant to section 995 of the Penal Code (allowing challenge to sufficiency of an indictment), the trial court dismissed counts 2 and 3, but left counts 1 and 4 intact. Fleming brought a writ petition to this court seeking dismissal of count 1, while McGill brought a similar petition seeking dismissal of count 4. For its part, the district attorney's office appealed the dismissals of counts 2 and 3. In *Fleming, supra*, 191 Cal.App.4th 73, count 1 was ordered dismissed, and the orders of dismissal of counts 2 and 3 were affirmed.

[5] From now on out, all undesignated statutory references will be to the Penal Code.

[6] Here is the complete text of section 939.7: "The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when *it has reason to believe that other evidence within its reach will explain away the charge*, it *shall order the evidence to be produced*, and for that purpose may require the district attorney to issue process for the witnesses." (Italics added.)

away the charge, especially the *knowing* element of perjury. The January 12, 2006 cover sheet was a short one, and could easily have been forgotten. Or a reasonable education administrator could easily not have considered it worthy of the word "report." Or it even might have been forged. It was the grand jury's province, not the district attorney's office's, to weigh those possibilities before indicting McGill for perjury.

(3) During the course of this writ proceeding, McGill presented a request for judicial notice of an affidavit from an investigator employed by the district attorney's office to obtain a search warrant of the school district's offices.[7] The affidavit recounted a conversation which the investigator had with Smollar involving events just after he and McGill had returned from the registrar's office, and that affidavit makes it look like the district attorney's office had concealed, in violation of section 939.71, certain statements from Smollar that were exculpatory of McGill (mostly showing that Smollar, rather than McGill, may have been the moving force behind the substance of the Jan. 12, 2006 memo).

But this court then gave the district attorney's office the chance that it had never given McGill—the chance to explain what appeared, on its surface, to be a fairly damning document. As we explain below, we are satisfied that there was *no* misconduct on the part of the district attorney's office connected to the memo.

However, the district attorney's office *did* fail to realize the degree to which Smollar's statements were indeed exculpatory of the perjury charge against McGill. The affidavit's recounting of Smollar's statements to the investigator suggested a scenario in which McGill was only perfunctorily involved with the January 12, 2006 memo (referred to by the district attorney's office as the "Second Enemies List"), such that she easily could have forgotten about it, or not considered it her own "report" to Fleming. But we stress: Being wrong on a legal point is not prosecutorial misconduct, it's just being wrong. We conclude there is no prosecutorial misconduct.

(4) California law affords all persons two alternative sets of protections to prevent defendants from being required to unnecessarily undergo the trauma and expense of a criminal trial. Those two alternative protections are either a preliminary hearing before a neutral magistrate, or an evaluation of the case

---

[7] There were two motions for judicial notice filed May 2, 2011, actually. One of them was to take judicial notice of written instructions given the grand jury basically in the form of jury instructions (for example, instruction No. 3 addressed witness credibility ["You alone must judge the credibility of the witnesses. . . ."]). The other was to take judicial notice of the investigator's affidavit submitted to the trial court to support of the search warrant. There was no opposition to either request, and they are hereby granted.

by an independent grand jury. That is, criminal procedure in California is a two-step process: First, an evaluation (by way of preliminary hearing *or* grand jury), *then* the criminal trial.

However, in the unique situation where, like here, the grand jury directly indicts a *nontarget witness* in the course of its investigation of someone else, the effect is to short-circuit important protections that the grand jury procedure is designed to afford: Section 939.5 requires a *neutral grand jury going in* to an investigation, not a grand jury that may already have a "state of mind" in reference to a potential indictment. (See § 939.8.)

A grand jury that indicts a nontarget witness for perjury in the very same proceeding in which it is ostensibly investigating someone else, is like a judge in a regular trial who, thinking a witness has just lied on the stand, immediately requires that witness to stand trial for perjury without either a preliminary hearing or an independent grand jury investigation. Consider: If the deputy district attorneys who thought McGill had *knowingly* lied in denying making any "reports" to Fleming about the lists had proceeded by way of a complaint and then a preliminary hearing, then McGill would have had the opportunity, before being required to face a criminal trial, of taking the stand herself and saying what she had to say about the January 12, 2006 cover memo. That neutral magistrate would then have made his or her own determination as to whether McGill's earlier testimony before the grand jury included a *knowing* falsehood.

Alternatively, if the deputy district attorneys who thought McGill lied to the grand jury investigating Fleming wanted to proceed by way of grand jury, they could have convened *another* grand jury (and the law makes express provision for such alternative grand juries, in § 904.6). That grand jury would not be personally entwined in McGill's alleged offense, and its members would naturally be focused on whether McGill simply forgot about the short cover memo, or didn't think it merited the word "report," or whether she even prepared the "report."

Moreover, by virtue of venerable California Supreme Court precedent (*In re Tyler* (1884) 64 Cal. 434 [1 P. 884] (*Tyler*)) in such a hypothetical second grand jury investigation, McGill would have had the *right* to bring exculpatory evidence to the attention of the grand jury (even if that grand jury would have been, at least theoretically, under no direct obligation to call her as a witness).

But in this case, where the grand jury that indicted McGill for perjury was *itself* the audience to whom the alleged perjury was directed, a direct

indictment by that very same grand jury effectively deprived McGill of the protections that she otherwise would have received from a neutral, independent grand jury.

## II. A PRIMER ON GRAND JURIES AND PRELIMINARY HEARINGS

Before we set out a detailed recount of exactly what it was that led to McGill's perjury indictment, a review of grand jury procedure is necessary. The class that is called "Criminal Procedure" in most law schools isn't really about *procedure* in the sense of examining the procedural steps involved in bringing a criminal case from alleged crime to trial, then acquittal or conviction and appeal. The typical criminal "procedure" course usually concentrates on substantive law, i.e., how the key provisions of the Bill of Rights relate to criminal justice. Actually, most attorneys never take a class in true criminal *procedure*, and so many lawyers, not to mention lay people, have only the vaguest idea what a "grand jury" is, or does. Indeed, even lawyers who work in the criminal law, and many judges, can go their entire careers without ever having to focus on the rules and dynamics of grand juries.

So here we go. As alluded to in part I., a district attorney's office cannot just require a person to go to trial on an allegation of a felony in one direct step. There are two alternative procedures to bring a person to trial.

The more common procedure is the initial filing, by the district attorney, of a complaint. Then comes a preliminary hearing, and, if the defendant is held to answer after the preliminary hearing, a document known as an "information" is filed. (See Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2011) §§ 7.3, 7.4, p. 150 ["A written complaint, subscribed under oath, can be a preliminary pleading in a felony case . . . ." "The complaint in a felony case is followed by a preliminary hearing. The pleading filed by the people if the defendant is held to answer for a felony after a preliminary hearing is the information."].)

The key stage in the complaint-preliminary hearing-information process is the preliminary hearing. Preliminary hearings provide a number of protections for persons accused of crimes: The accused has the right to be represented by counsel, the right to appear before a neutral magistrate, and the right to tell his or her side of the story. The accused also has the right to present his or her own evidence, and to call witnesses on behalf of the defense, plus cross-examine hostile witnesses. (*Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 587 [150 Cal.Rptr. 435, 586 P.2d 916] (*Hawkins*).) The neutral magistrate is not required to believe the prosecution's witnesses, but

can decide credibility conflicts in favor of the accused. (*Berardi, supra,* 149 Cal.App.4th at p. 498.) By far the vast majority of felony criminal cases in California go by way of the complaint-preliminary hearing-information procedure.[8] (See *Hawkins, supra,* 22 Cal.3d at pp. 605–606 (conc. opn. of Mosk, J.).)[9]

The grand jury procedure operates differently. (Because this case involves a grand jury proceeding, we will go into more detail on grand juries than we will about complaints, preliminary hearings and informations.)

Generally speaking, there is one regular grand jury in each county, which serves for an entire year (§ 905), though, as noted above, there can be another grand jury at the same time (§ 904.6). In fact, as the California Grand Jurors' Association itself has said, an additional "optional" grand jury "dedicated to hearing criminal matters" operates in almost half of California counties. (Cal. Grand Jurors' Assn., *Comments of the California Grand Jurors' Association on Professors Vitiello and Kelso's Tentative Recommendation Reform of California Grand Jury Statutes* (2002) 35 Loyola L.A. L.Rev. 609, 623 (hereinafter, Grand Jurors' Association Comments).) Grand juries are selected by the superior court (the trial-level court), and, depending on the population of the county, will consist of either 23 persons (in counties over four million), 19 persons (in counties between 20,000 and four million) or 11 persons (in counties under 20,000) in population.[10] (§ 888.2.)

Important to understanding California's grand jury system is to realize that each regular county grand jury has a *dual role*. One of those roles is commonly referred to as the "civil watchdog" role. One of the main reasons that California's Constitution expressly provides for grand juries (see Cal. Const., art. I, § 23) was to preserve that watchdog role over allegations of local corruption. (See Vitiello & Kelso, *Reform of California's Grand Jury System* (2002) 35 Loyola L.A. L.Rev. 513, 519 (hereinafter, "Vitiello-Kelso article") [noting that in Cal., the grand jury "was born" out of a "pre-Civil War

---

[8] Though of course the figures given by Justice Mosk in 1978 need to be updated.

[9] Since *Hawkins* was decided in 1978, Proposition 115, adopted in 1990, made a few changes to preliminary hearing procedure. The changes made by Proposition 115 are summarized in *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 342–346 [276 Cal.Rptr. 326, 801 P.2d 1077]. Proposition 115 allows for hearsay testimony at preliminary hearings (see 52 Cal.3d at p. 343), and amended section 866 to provide that the prosecutor may demand an offer of proof as to defense testimony, to require magistrates to not permit testimony unless it meets certain criteria (e.g., it establishes an affirmative defense, negates an element of the crime, or impeaches a witness), and to make clear that the purpose of the preliminary hearing "is to determine probable cause, not to afford the parties an opportunity for further discovery." (52 Cal.3d at p. 344.)

[10] By our count, there are still about seven counties in California that are under 20,000.

tradition" as a watchdog over local corruption].) It is in the civil watchdog role that one might, for example, read about a grand jury "report" on some aspect of local government. (Cf. Grand Jurors' Assn. Coms., *supra*, 35 Loyola L.A. L.Rev. at p. 611 [noting that grand jurors' association was itself "focused on the civil function of grand juries and professes no expertise with respect to the criminal indictment function"].) Provision for the civil watchdog function of grand juries is found in sections 925 through 933.6, providing for investigation of county, city and district governments. We stress that we do not address the civil watchdog role of grand juries in this opinion.[11]

This case, rather, involves the second of the grand jury's two roles: to investigate allegations of crime (the key phrase is "public offense" (see § 889)) to determine whether, after an investigation, an indictment should be filed against a person. An indictment does not require unanimity: a minimum of 14 grand jurors is required if the total is 23, a minimum of 12 in counties where the total is 19, and a minimum of eight in counties where the total is 11. (§ 940.)

■ Members of the grand jury may *themselves* initiate a criminal investigation leading to an indictment (§ 918), as, of course, may a district attorney's office (§ 935). The investigation is held in secret. Indeed, it is a misdemeanor for a grand juror to willfully disclose evidence adduced before the grand jury (§ 924.1). There are reasons for this secrecy: Two of the original reasons for grand jury secrecy were to "reduce the influence of the monarch" and guarantee impartiality. (*People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403, 414 [92 Cal.Rptr.2d 829] (*Mouchaourab*).) ■ Today, of course, while we do not worry about the influence of the Crown, impartiality remains an important feature of the grand jury system—California law requires members of the grand jury to be absolutely neutral in regard to any criminal matters before them (§ 939.5). Secrecy is also justified today by the concern that persons who are investigated by the grand jury, but against whom no indictment is returned, should not have their reputations sullied. (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 43, fn. 3 [2 Cal.Rptr.2d 376, 820 P.2d 600] (*Bowens*).) Also, secrecy serves to deter the risk of flight. (*Ibid.*)[12]

After the investigation, the grand jury must "find an indictment" if "all the evidence before it, taken together, if unexplained or uncontradicted, would, in

---

[11] Nor do we have occasion to in any way address the topic of the demographics of grand jury selection, a point that has occupied any number of commentators. (E.g., Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at pp. 581–601.)

[12] There is a more comprehensive catalog of reasons for the grand jury procedure given by Justice Mosk in his concurring opinion in *Hawkins, supra*, 22 Cal.3d at page 604.

its judgment, warrant a conviction by a trial jury." (§ 939.8.)[13] On the other hand, the law also provides for a public exoneration if the grand jury does *not* return an indictment. Section 939.91 provides that if the grand jury investigates a "charge against a person," and "cannot find an indictment," the grand jury is required to issue a report (or a declaration) stating that a "charge against" the person was investigated and the grand jury "could not as a result of the evidence presented find an indictment." (Of course, the person under investigation must request it, and the court must ultimately approve.)

If the grand jury does return an indictment, there will be no preliminary hearing. (Cal. Const., art. I, § 4.1, also known as "Proposition 115" adopted by initiative in 1990.) The case will head for a criminal trial of the accused, *unless* the court sets aside the indictment pursuant to a motion brought under section 995.

█ There are several aspects of the grand jury's investigation leading to the indictment that are noteworthy. First, the grand jury procedure does not afford a number of protections otherwise afforded the accused in the complaint-preliminary hearing-information procedure. There is no right to be represented by counsel, no right to confront or cross-examine hostile witnesses, and no right to object to evidence introduced by the prosecutor. (*Hawkins, supra*, 22 Cal.3d at p. 587.)

However, as Justice Richardson asserted (in our opinion, for what it is worth, correctly) in his dissenting opinion in *Hawkins*, the California Constitution "vests" the Legislature with power over the grand jury procedure. (*Hawkins, supra*, 22 Cal.3d at p. 610 (dis. opn. of Richardson, J.).) And the Legislature has provided accused persons with its own set of protections in the course of grand jury criminal investigations. Justice Richardson pointed out, for example, that grand jury secrecy serves to protect the "accused's reputation." (*Id.* at p. 618 (dis. opn. of Richardson, J.).) Other protections Justice Richardson noted are: Every indicted defendant is entitled to a complete transcript of proceedings. All witnesses, regardless of whether they are targets, are protected against self-incrimination. Grand jurors are authorized "to order additional evidence" if "they have reason to believe it will explain away the charge . . . ." (*Ibid.* (dis. opn. of Richardson, J.).) And prosecutors must inform the grand jury of any evidence " 'reasonably tending to negate guilt.' " (*Id.* at p. 619 (dis. opn. of Richardson, J.), quoting *Johnson v. Superior Court* (1975) 15 Cal.3d 248, 255 [124 Cal.Rptr. 32, 539 P.2d 792] (*Johnson*).)

---

[13] While the statutory word is to "find" an indictment, most courts say "returned." (E.g., *People v. Booker* (2011) 51 Cal.4th 141, 156 [119 Cal.Rptr.3d 722, 245 P.3d 366] ["The grand jury returned the indictment at issue."].)

Readers should bookmark those words: "reasonably tending to negate guilt." They will become important in part VI.C. of this opinion where we address the merits of the district attorney's arguments that Smollar's statements to the investigator were not "exculpatory."

■ We would also point out several protections built into California grand jury procedure in addition to the ones that Justice Richardson cataloged in *Hawkins.* An extremely important one is that grand jurors must be absolutely neutral. (§ 939.5.) If grand jurors have a "state of mind in reference to the case" they must "retire" from considering it. (*Ibid.*) Also, the Legislature has provided that the grand jury may, *on its own*, require the attendance of witnesses. (§§ 939.7, 939.2.)[14] And a grand jury also has the power "at all times" to request that a judge be present in its proceedings. (§ 934, subd. (a).)[15]

With this background, we now recount in detail what happened at the grand jury's investigation of James Fleming that led to the indictment of Susan McGill for perjury.

### III. THE GRAND JURY PROCEEDINGS IN THIS CASE AS THEY RELATE TO McGILL

Many readers will have never seen a transcript of a grand jury proceeding, and so the overall flavor of such proceedings may not be exactly clear to them. There was no judge. Two trial-level deputy prosecutors, operating tag-team style, took turns asking the witnesses various questions, often repeating substantively the same question many times.[16]

We will first recount in detail the examination of McGill before the grand jury in August 2006. Next we will describe the January 12, 2006 document

[14] The power is inherent in this language from section 939.7: The "grand jury . . . shall order the evidence to be produced . . . ." And the power is explicit in section 939.2. That statute provides in its entirety: "A subpoena requiring the attendance of a witness before the grand jury may be signed and issued by the district attorney, his investigator or, upon request of the grand jury, by any judge of the superior court, for witnesses in the state, in support of the prosecution, for those witnesses whose testimony, in his opinion is material in an investigation before the grand jury, *and for such other witnesses as the grand jury, upon an investigation pending before them, may direct.*" (Italics added.)

[15] However, unless so requested, a judge shall not be present during sessions of the grand jury. On the other hand, the county's district attorney's office "may at all times" appear before the grand jury to give "information or advice" on "any matter cognizable by the grand jury," and may also "interrogate witnesses before the grand jury whenever he thinks it necessary." (§ 935.)

[16] We stress that the deputy district attorney handling the appellate side of the McGill prosecution had nothing to do with this grand jury proceeding. In appellate litigation, you go to reviewing courts with the record you have, not the record you want.

which forms the core of the perjury allegation against McGill. Then we will recount, in even more detail, the testimony of McGill's secretary, Thacker, in May 2007. Finally, we will recount testimony from other witnesses to the grand jury concerning David Smollar.

We apologize for the length of part III. of this opinion, but, to be plain, a line-by-line recounting of the questioning of McGill's secretary, Thacker, reveals a process that, upon reading it, actually seemed a bit shocking to a court that normally reviews transcripts of proceedings overseen by judges. Readers should remember that not only was there no judge who presided over the proceedings, but neither McGill nor Thacker had counsel (or reason to believe at the time they were questioned that they would need counsel). Our narrative is an attempt to recreate, as best we can, the apparent flavor of what took place as it happened before the grand jury. Readers who plow through this part of the opinion can judge for themselves whether or not "badgering" is too a strong word.

### A. *McGill's Testimony*

### 1. First Day's Testimony

At the beginning of her testimony, the deputy district attorney conducting the proceedings assured McGill that there was no expectation she would be faced with criminal charges: "Also, I want to advise you that based on information that we now possess there is no expectation or intention at this time of seeking any charges against you personally as a result of this investigation. Do you understand that?"

Then McGill testified: Fleming had appointed her, being assistant superintendent, as "the point person from the District to communicate with Neal Kelley [(the Orange County Registrar of Voters)], when we were involved with the recall." That is, while the recall signatures were being gathered, McGill called the registrar to ask him about "time lines" involved in the recall and ask him "when will we start to hear something." At the time, all she knew was: "People were out there and they were trying to get signatures, but that was about it."

McGill learned that the recall effort had failed sometime in December 2005, when Registrar Kelley called her to tell her that "they didn't have enough valid signatures." Later (in apparently another phone conversation with Kelley), Kelley mentioned "that some of the people who had collected signatures were coming in to look at the petitions and look at the validation process." McGill "said gee, could I come up and do that?"

There was, by early December, some worry on the part of Fleming and his staff that the school district itself might have to pay for the "tallying" of the count of signatures, but in January McGill's fears on that account were assuaged, apparently by Kelley himself. About the same time, McGill asked Kelley "if we could come and look at the validation process," i.e., "how the petitions were validated." McGill was "just interested in . . . why some of the signatures were not valid and some were." Fleming said it "would be okay if [McGill] went," indicating it would be a "good idea" to look at how signatures are validated.

One of the two deputy prosecutors then asked if she made the trip out of "pure curiosity." McGill said: "We thought we were going to be sued, the District. They were going to be. And so we thought it might be good to know why—how the signatures were validated and what caused them to be not valid signatures." In fact, Fleming and his staff (certainly including McGill herself) "had heard that we might be sued."

So, McGill, along with the district's public information officer, David Smollar, went to see Kelley about the "process" of validating signatures, which included comparing signatures on record with those turned in.

Smollar himself "asked to come along," though the request caused a certain apprehension in McGill. McGill was "nervous because Mr. Smollar had been very upset" with her because Fleming had asked her to "do this job" (apparently referring to being a point person with the registrar's office). In fact, back in September 2005 Smollar had "verbally attacked" McGill. In fact, McGill had hoped that a third person would accompany them on the trip, but that person was not available. She would also testify that David Smollar generally "didn't talk to me," apparently referring to public information requests related to the recall.

McGill explained their relationship: Fleming wanted McGill to do "some of the duties that David [Smollar] had been doing." But Smollar "was not very happy about the changes and so he did not work with me," and McGill "worked independently of him." This meant more public relations duties, though nothing "specifically" about the recall.

Once at the registrar's office, the tour also included viewing piles of petitions in stacks on long tables. McGill and Smollar asked to see the petitions: Kelley said yes, noting that "other people had come in from the recall" and had looked through them.

McGill then testified that Smollar wrote down some names of people who had "passed out the petitions." McGill was "sure" that she and Smollar talked about people that they "recognized."

The prosecutor was asked whether Superintendent Fleming had told her to write down a "list" of names. She said no, "he did not."

At this point the deputy prosecutor asked McGill about the subject of motivation. One of her motivations, testified McGill, "was just seeing the process." And another motivation, said McGill, was "possibly" to prepare for a lawsuit, though that was not McGill's "intent" when she went. "I was just going to see the process."

She told Fleming about the visit when she got back, though she did not tell him that Smollar "had got a list of the recall petitioners." Rather, she figured that Smollar himself "was probably going to handle that with Dr. Fleming."

It was not until months later, when a newspaper story surfaced about an "enemies list," that McGill made any connection with the names Smollar had written down. The morning of the story, Fleming called McGill and the rest of his staff ("everybody" was her word), and said "this is the list that they were referring to." But it "wasn't a list that" McGill "had ever seen." Even so, she assumed that the matter was "something that David [Smollar] handled and that he might have had a conversation" with Fleming about it, but she was "not involved." After all, Smollar also had a "working relationship" with Fleming. And she "didn't even know what David [Smollar] did with the list."

## 2. Second Day's Testimony

When McGill returned to the grand jury on August 21, 2006, a new deputy prosecutor began as her inquisitor. Despite previous testimony that it was her own idea to make the visit to the registrar, on the second day the new deputy asked McGill to say that the trip to the registrar's office was Fleming's idea, not hers: "You were instructed by Dr. Fleming to go to the Registrar of Voters to learn about why the recall failed, correct?" McGill replied that Fleming said "we could go," though he hadn't said "go there."

McGill was asked if she ever "did brief Dr. Fleming on the procedures for the recall." The "briefing" didn't take long though; it was over "very quickly."

This new prosecutor soon returned to the subject of the list: "And when you and David [Smollar] then decided, hey, pot of gold. I got a roomful of names. Let's find out what names, correct?" To this McGill answered, "correct," and then agreed with the prosecutor's next statement that Smollar "started writing those names down." McGill said she also "started looking through those petitions."

The prosecutor then built on the "enemies list" theory of the case: "The reason you were looking through those petitions was to see which person actually circulated that petition, were you not?"

McGill corrected him: "The reason we started to look through the petitions was to look at if we could see why the signatures were invalid."

McGill stuck to her story that they spent maybe a half an hour to 45 minutes in the office, as distinct from a longer period of time (which is what the prosecutor obviously wanted to hear). For her part, McGill could not "remember" writing down any names, though she did tell Smollar some of the names. She referred to herself and Smollar as "we," which may explain why she answered "That's my understand [*sic*]" to the prosecutor's question of: "You only wrote down the circulators names?" That is, McGill told Smollar some of the circulator's names in addition to those he wrote down himself. McGill, however, answered "I don't know" to a question of why they seemed to "place some importance on the fact that [they] needed to identify the circulators; why?"

At this point the prosecutor returned to his theme that McGill had really been put up to the task by Fleming all along: "Did you just make this up? Were you directed to do it?" When she answered "no," he asked, "This was all of your own free will?" McGill said, "yes."

Then again, the prosecutor continued on the theory of a scheme originated by Fleming: "And it was your plan?" McGill countered, "It wasn't any plan. It was just we were there, we were looking through, and these are the people who had circulated the petitions."

The examination next turned to events after returning from the registrar: "Then you never gave any report about the names you saw in there to Dr. Fleming, correct?" McGill answered "That's correct." She reiterated her testimony that she simply had told him about recall procedures.

The prosecutor then introduced the theme of waste of money: "And so you spent an hour of school time just passing your time writing up these names for no apparent reason?" McGill's answer: "I guess. David Smollar was the one who was handling the name part," though they were, she "admitted," working "together as a team" while looking at the petitions. The decision to write down the names was a "spur of the moment" decision, though McGill answered "I don't know" as to why the task was "important."

McGill soon said that she didn't know "what happened" to the list of names Smollar had written down.

The prosecutor then tried (yet again) to link Fleming with the list: "All you know is later you saw Dr. Fleming with that list?" To that, McGill answered "no." The prosecutor returned to the same question: "You never saw Dr. Fleming with that list?" Answer: "No."

The prosecutor then asked: "What happened to the list?" McGill answered: "I don't know."

"Did you ever ask?" McGill said "no."

Soon the prosecutor returned to the aftermath of the visit. Had McGill ever "put anything in writing" about her "efforts with respect to the recall?" She said "no."

Then he got more direct: "You never wrote any memo to circulate about the strong public relations efforts we're going to make with respect to the recall?" McGill answered: "not with respect to the recall."

And soon again: "Did you ever prepare anything on the computer or in writing concerning being the point person of the recall?" McGill: "Not that I remember. We did it verbally."

And again: "So did you prepare memos for the school superintendent? You had other wide range of duties as the assistant superintendent. [*Sic.*] Was all of your information [*sic*] passed on to the superintendent just through personal meetings?" McGill: "Correct."

Soon, the prosecutor from the first day started asking questions: Upon her return to the school district's office, the prosecutor asked, had she told Fleming that she "recognized any names at the registrar's office?" She didn't remember.

Did Fleming ask her "whose names were on the petitions?" She didn't remember.

Did McGill tell Fleming that Smollar "had written down some names while [they] were there?" McGill: "No."

Finally, questions turned to events beyond the day of the visit to the registrar's office. In the last week of June 2006, McGill overheard Fleming say something to a reporter about a "hit list." The next morning Fleming "called us in and he showed us some list that the newspaper reporter had sent to Dr. Fleming." And at that time, she spoke up and told Fleming that Smollar "took down some names when we went up to the registrar's office,

and so I thought maybe that could be" (presumably she meant the list mentioned). McGill continued, "But the list that I was shown was not the list that I thought David [Smollar] had—the names he had written down." For McGill, "it didn't look like the same list." It wasn't, for example, a "handwritten list." (We may pause to note here that, as explained more thoroughly in *Fleming*, there were two so-called enemies lists, one compiled in spring 2005. The so-called "first enemies list" is not at issue in this proceeding.)

When Fleming showed McGill the list afterwards, he asked if McGill had ever seen it, and she said no. She mentioned that while Smollar had written down some names at the registrar's office, the names on the list she was shown "didn't look like they were the same." Fleming himself never "followed up" with any questions about Smollar's writing down names.

This was the "first time" McGill told anyone that Smollar had written down names.

When asked about the subsequent media "furor" about the enemies lists, McGill responded that there was confusion at the office because "people didn't know what list the media were referring to."

### B. *The January 12, 2006 Memo*

About a month after McGill's testimony, the district attorney's office came into possession of a short cover memo, ostensibly from McGill to Fleming. There is no dispute that the memo was discovered in Smollar's "things." (Where, precisely, those "things" were found is not clear in this record.)

We have already quoted the cover memo in full (see fn. 1, *ante*), but a few more details are now appropriate. The document may be divided into three distinct parts. Part 1 was the one-page cover memo from McGill to Fleming dated January 12, 2006. Part 2 can be described as two "simple" lists of names, with initials after each name that appear to be names of cities in the school district. (E.g., "John Smith DP" with "DP" presumably standing for Dana Point.) The two lists had headings. The first list said the following names were petition gatherers who accounted for as many as 90 percent of the petitions submitted to the registrar, and the second list were petition gatherers on "fewer" petitions. Part 3 was a computer-generated spreadsheet giving the *same names*, but with addresses, names of children in the school district, schools attended and phone numbers. (The sets of spreadsheets followed each of the two "simple" lists, but, for reasons that will become clear in pt. VI.C., it makes more sense to treat the spreadsheets as a separate, third part of the document.)

At the bottom of each spreadsheet is this code, in very small print: "C:\Documents and Settings\BTHACKER\My Documents\McGill\Parent Lookups2 1-11.doc." Underneath that line were the printed initials, "bt."

McGill was never called back to explain if she knew why her name might be on the cover memo, or how it might be reconciled with her testimony that she had not given any "report about the names" to Fleming.

## C. *Thacker's Testimony*

The grand jury investigation continued on into the next year. In May 2007—in transcript terms about four volumes after McGill's testimony— Barbara Thacker, a school district secretary, was called to testify. She said that Fleming had assigned Thacker to be McGill's secretary in August 2005. She worked for McGill until McGill's retirement in June 2006.

Typically, when McGill wrote letters in her job, she would give Thacker information and Thacker would "word process it." In fact, McGill would often give Thacker "things to type up or to input into [her] computer."

Fleming had never talked to Thacker about McGill working with the registrar's office, and McGill herself had "not really" talked about "the type of work she was doing with the registrar," though McGill did tell Thacker "she was going to the registrar," a point Thacker didn't consider any "big deal." (And of course McGill said things like, "If Neal Kelley calls, get me.")

Thacker recalled a trip to the registrar's office that McGill made with David Smollar in January 2006, though she didn't remember whether it was in January "exactly." This was, Thacker believed, after the registrar had ruled the recall had failed. Thacker did observe, though, that the trip seemed "spur of the moment."

McGill came back to the office "maybe" a "couple hours" later. She also saw David Smollar that day. He "seemed all excited," even though McGill was acting "just normal."

The prosecutor soon asked a question related to the January 12 memo: "After that, her second visit [(the one with Smollar)], did she ask you to help her with some documents from the registrar's office?"

Thacker's answer was not exactly paydirt: "Not that I recall. But it's possible." In fact, Thacker didn't "recall anything specifically from the registrar's office."

More directly, the prosecutor asked: "And do you recall working on a specific set of documents and set of names and a memorandum regarding her second visit to the registrar's office?"

Again, the answer was not paydirt: "You know, I really don't."

But then Thacker added: "But I have been shown that I did do something, because my initials are on it, so therefore, that leads me to believe that I did sign something that you might be referring to."

We should pause here to note that the spreadsheets mentioned above in our description of the January 12 memo have a "bt" in tiny print down at the very bottom. However, the first memory that Thacker had of the document was when *Fleming* showed it to her the previous August (of 2006).

Then the prosecutor showed Thacker the January 12, 2006 memo. Thacker immediately exclaimed that she did not type the "top page," apparently referring to the cover memo ostensibly from McGill to Fleming.

She was then asked this question: "Who typed it?" Thacker's exact words: "I don't know, but probably Susan typed it. She did a lot of her own typing." Thacker then noted that "Susan McGill would create her own face sheet for a memo," and "did a lot of her own typing."

The prosecutor then asked about the squiggle. "So the initials that are next to her name, were those—do those look like her initials?" Thacker: "Yes."

Thacker went through the document. She said she did not type the list of names on the second page, and didn't know who did.

Thacker did acknowledge, though, that she created the spreadsheets, and saved them to her own "C" drive in her computer.

Why had she created the spreadsheets? Thacker replied: "Well, I was probably given a list of names and asked to find out their information and make a database. It's not unusual."

And who had asked her to create the spreadsheets? Thacker's exact words were: "Probably Susan McGill."

But, did Thacker actually "recall her asking" to prepare the spreadsheets? Thacker was again equivocal: "Not specifically, no, but she was my boss. She would be the one to give me direction."

Thacker went on to acknowledge making two separate spreadsheets. But what about the simple list on page 2? Did she create the spreadsheet from that? The answer was again equivocal: "I guess I did."

"You guess you did, or you did?" asked the prosecutor. Thacker continued: "Yes, I did, I guess. I did. I did."

Thacker explained in the same answer: "You see, I saw the list once. I just saw this once. I really didn't examine it until today. Dr. Fleming asked me if I typed it. I said my initials are there, so I'm assuming I did. But I probably—I was probably given this information on this piece of paper and asked to look up their addresses and create a spreadsheet. But I didn't analyze why or anything like that."

The prosecutor zeroed in on McGill: "I'm talking about your original assignment from Susan McGill. Did use [sic] Susan McGill hand you the list on page 2 for the 90 percent petition gatherers and also the list on page 5 with the less than ten or fewer petition gatherers, and you were asked to make a spreadsheet from it?" Thacker replied: "I'm going to say yes."

Asked what McGill told her "as far as why" when given the assignment, Thacker replied, "Well, she didn't give me any reason why."

The prosecutor asked the question again: "What were her directions to you? What exactly did she want?" Thacker said, "I don't remember why, what she said. She probably asked me—I don't remember the specific directions."

After explaining how the district's "Aeries" computer program could correlate lists of names with school attendance boundaries and children in school, Thacker was asked if McGill herself had Aeries. Thacker didn't know.

Then again, if McGill had given Thacker a list of names, the program would have generated a spreadsheet that would come out just like the ones attached to the January 12 memo.

After some more explanation as to the nature of the computer program, the prosecutor was now ready to assume that McGill had given Thacker the list: "And when Ms. McGill gave you the list, though, do you recall her giving you this list on page 2 and going off of that list?"

Thacker, however, returned to the uncertainty that McGill had given her the list in the first place: "Not specifically. I don't remember her giving me that list. But I believe she probably did."

"She probably did give you this list?" the prosecutor asked. Answer: "Yes."

So the prosecutor continued, confident his assumption had been vindicated: "And what did she tell you to do?"

This time Thacker was not unequivocal: "Type it up. I think she wanted these people's names and addresses."

But the certainty was short-lived—when the prosecutor asked almost the same question again, "What did she tell you?," Thacker's response again returned to the equivocal: "I don't recall specifically what she told me."

The prosecutor tried asking the question a third time, but with the tack of general instructions: "Generally what did she tell you? What were her instructions to you?"

Thacker yet again was uncertain: "I don't know really what her instructions were." Then she added, "But I—I believe that it would probably be I want a list of all these people and their addresses and phone numbers. Something like that."

And a fourth time: "Do you remember her doing that?" Thacker was at least unequivocal that she didn't remember: "No."

And a fifth: "You have no recollection whatsoever of that assignment?" Thacker's answer was again in the negative: "Not really, no."

But then came this question: "And when you were given this assignment, you noticed that this had to do with all of the petition gatherers for the recall, right?" To which Thacker's answer was "yes."

The prosecutor seemed puzzled that such an important document involving recall supporters should not have "caught" Thacker's "attention." After all, it was "not just another type up a memo assignment." But Thacker said she was "so busy" she "just typed up the list." And, accordingly, Thacker never wondered "what Ms. McGill needed the spreadsheet for."

Thacker was asked what she did with the spreadsheet after finishing it. Again the word "probably" figured prominently in her answer: "I probably gave it to her."

And a sentence later, used the word "probably" again: "I probably printed it out and gave it to her."

The possibility that Smollar had authorized the list came up briefly in Thacker's description of some searches of her computer after the lists had become public. Another secretary told Thacker that "She found a list in David Smollar's things that I typed and she showed it to [Jeff, a school district compliance officer who came to her computer]. I guess Jeff showed it to Dr. Fleming. And so then that was when Dr. Fleming called me and said did you type this. I said I don't recall, but my initials are on it, so I must have."

And then the prosecutor returned to his puzzlement that Thacker had no recollection of getting the assignment. It was an "unusual" assignment, so "certainly you would have remembered doing it, correct?"

Thacker stood her ground on the point: "You know, I am a smart person, and you would think I would remember doing things like this, but I do so many different things, nothing surprised me. I just would do anything."

The prosecutor got really direct: "Are you trying to protect Ms. McGill?"

Thacker replied, "I'm not trying to protect anybody. I just don't remember specifically being asked to do this, but I'm assuming that because she was my boss, she did. She gave me many, many, many assignments. You kind of go through the day, you don't really think about it, to be honest."

Soon the prosecutor asserted the theme that Fleming had told McGill to compile the list: "Well, just from reading Ms. McGill's own typing, it looks pretty clear that he [(Fleming)] told her to go and find out who the petition gatherers were, correct?"

Thacker didn't know anything about that: "Well, I can't speak for what he told her to do."

And the prosecutor then presented this assertion: "But it's pretty clear, isn't it, that the intention of Dr. Fleming and Ms. McGill is to find out who those people were, where they lived, who their kids were, and what schools they went to?"

Thacker could only speculate: "It may have been more who, they wanted to know who the people were. I don't know that he wanted to know anything about the kids."

And the same question was asked yet again: "But you don't remember any direction or any instruction that Ms. McGill gave you?"

"Not specifically," Thacker answered.

And again: "I'm just trying to figure out that if you're clearly—you clearly think that the investigation and a lot of the aspects of it are wrong [(apparently referring to the lists and not the grand jury investigation)], yet you are unwilling to give any details about why you created this document for Ms. McGill. So—"

"Well," Thacker answered, "I created it because she asked me to. I'm [*sic*] mean, I'm just a secretary typing."

And the same question yet once more: "She didn't give you any reasons why?" This time Thacker said, "Huh-uh."

When asked more generally if she and McGill ever talked "about the recall at all," Thacker said that "We all talked in general terms about the recall, like how is it going, and is it going to pass."

The prosecutor was, if nothing else, persistent. He soon asked yet another variation of the same question: "The list that you were given by Susan McGill in order to make the spreadsheets, were they the list [*sic*] gathered from her first visit or her second visit?" Thacker said: "That I do not remember. I don't remember."

The prosecutor then showed the typed up list on page 2 (one of the pages of what we have called "part 2" of the Jan. 12, 2006 memo). Did it, he asked, "appear to be typed by Susan McGill"? Thacker said, "I don't know who typed that. It doesn't really look like anybody's style that I recognize. Let's put it that way."

The prosecutor showed Thacker a copy of page 2 of the memo, and told her: "Keeping in mind this is a copy which was faxed, so it may not have all the pertinent information, when you had the list and you made the spread-sheet from it, do you recall working off of an e-mail computer screen or document on a computer screen or a piece of paper?" Thacker answered "Piece of paper probably."

The prosecutor then asked the same question again: "Susan McGill gave you the piece of paper?" And this time got the answer he wanted: "I'm thinking yes, she did."

The subject now turned to Smollar: "You never got an assignment—you didn't get this assignment from David Smollar in any way, did you?"

"David Smollar did not really give me anything to do," said Thacker. "I didn't work for him."

"He didn't give you this assignment?"

"I don't believe he did."

"He didn't give you the list of names to work off?"

"I don't believe he did."

After some questions about how the spreadsheets were put together, the prosecutor returned to his theme that McGill had given the assignment to Thacker: "And then the subheading is from McGill because that's who gave you the assignment."

Thacker said: "I put that, it means McGill is the place where I filed it on my computer. In her folder. So that would probably mean that she gave it to me to do."

The second prosecutor (the "bad cop"—this one tended to ask the more argumentative questions) then took over.

After a series of questions about the Aeries computer program, the prosecutor turned again to the list, and an attempt to establish that McGill had given it to her.

"Is it your testimony here today that you provided all this information because it was at Ms. McGill's request?"

And once again Thacker had no distinct memory of McGill giving her the list: "I believe that it must have been at her request, since she was my boss. I didn't really take direction from anybody else. But I don't specifically remember her giving me this list."

The subject turned then to a conversation Fleming had with Thacker about the lists in August 2006. Fleming had the list "in his hand" when Thacker walked into his office.

Fleming handed Thacker the list, along with the cover memo, to review. Fleming asked if she had typed it. Thacker noted her initials at the bottom. Thacker had "heard there was a hit list," but she had thought the idea "ridiculous."

Fleming asked Thacker if she "typed this list." She said, "I don't recall, but I must have, because my initials are on it."

Fleming asked, "Did Susan give you this to type or did David?" Thacker said, "It must have been Susan, because David doesn't give me anything to do." And Thacker left.

The testimony soon turned to Thacker's computer. The school district compliance officer came to check her computer, got a pen drive, and made a "copy of something." Thacker was not there at the time.

Thacker would later talk to the secretary of the compliance officer who checked her computer. Among other things, the secretary said that "she found some papers in David Smollar's file and gave it to Jeff [(the compliance officer)], and that she had seen my initials."

The inquiry then took a turn toward Thacker's role in the wake of her meeting with Fleming. She tried to find "the document" (presumably meaning the list she made using the Aeries system), but she "really couldn't find anything related to—"

"When," the prosecutor interjected.

"So I gave it up," Thacker finished.

The prosecutor then asked if she did all four pages at the same time. Thacker didn't remember. "It wasn't," she said, "like a big project."

The prosecutor asked if she might have deleted it once completed. "Absolutely not."

In the context of who, exactly, Thacker had spoken with about the case, the prosecutor's comment that "it is a list, is it not?" elicited this response, perhaps not entirely on topic: "It is a list, but to me it wasn't a bad thing, because in my mind I didn't think it was a bad thing when I—I would never do something that I thought was illegal, immoral, whatever. Yes, it's a list. I typed many lists. I type lists all day long."

At that point Thacker acknowledged that the list had indeed been discovered "on my computer," a point that had come up in a conversation with her boss at the time. Thacker elaborated: "The list was found on my computer. Maybe I would have to be involved or something. It was just ironical that there was a list and that it would be found on my computer, because I absolutely in no way thought that I had anything to do with it, you see."

The prosecutor then turned to details revealed about the list from the tiny print on the bottom. The numbers "1-11" stood for the date of the document.

The 2 after "Parentlookup" showed it was the second document of January 11. Thacker then said she never had to revise the document.

The other prosecutor then took over, and began asking about David Smollar. Did Thacker remember when, in May 2006, he resigned? No. Thacker was on vacation.

Did Thacker remember an article in the newspaper after Smollar quit about "there being a list." She "heard" about it.

The prosecutor turned to the subject of a retired judge, Stuart Waldrip, who had been hired by the school board in August to do an investigation. No, Thacker had not read Judge Waldrip's subsequent report, but yes, she had spoken with him.

Then back to the subject of what the compliance officer's secretary had told Thacker about finding (in the prosecutor's words) "a hard copy of the memo, the McGill memo, in David Smollar's file." It was after that that the compliance officer came to look on Thacker's computer. She didn't know whether the compliance officer had erased the file, though she acknowledged that she couldn't find it afterwards by accessing her "C" drive.

Thacker did say, though, that if she had given a hard copy of the spreadsheets to McGill, McGill would not have been able to access it through her computer, since the document was not in a shared folder. Thus, the prosecutor asserted, the only way that David Smollar could have had a copy of the spreadsheets was if McGill had given it to him. "That would make sense," Thacker responded.

Well, the prosecutor rejoined, could Thacker think "of any other way"? Thacker agreed that that would be "the most logical way," but added, "I didn't give it to David."

"You only gave a copy to Susan McGill" the prosecutor inserted. "Right."

"The only way someone could get a copy is from that original copy, like if Susan gave it to copy" the prosecutor asserted.

"Or if I made a copy, but I didn't make a copy. I gave it to her."

What if "someone accessed" Thacker's computer?

Thacker noted one would need a password.

And with that, there were no further questions of Thacker.

### D. *Testimony about Smollar*

Several of the grand jury witnesses also mentioned David Smollar. The first witness to testify, Kate McIntyre, Fleming's personal secretary, noted that on the day of the trip McGill had been "petrified" when Smollar invited himself because he bore a grudge against McGill:

"Q. And David Smollar went with her [McGill]?

"A. He asked if he could go with her. She didn't—he had been very mean to Susan. He is not a very nice person, so she was petrified to go with him. But he went anyway. She didn't want to go with him. But he did go. But he was not told."

The prosecutor then suggested that McIntyre was overstating things: "Did he kidnap her?" McIntyre said, "No, he just yells and screams."

McIntyre soon also pointed out that she "heard David went in [to Fleming's office] and showed them [apparently McGill and Fleming] but I never saw anything. I was just—I've heard since then David had copied down some names and went in and showed them to Dr. Fleming. And Dr. Fleming didn't want anything to do with it. That's what I heard."

Another witness, Marlene Draper, the school board president, said that McGill told her, after the visit to the registrar's office, that "she was upset that David Smollar was writing down the names."

Sherial Hahn, the district's chief financial officer, also testified that Smollar told her he wrote down names at the registrar's office.

### E. *Instructions About Smollar*

At the very conclusion of the grand jury proceedings, one of the prosecutors instructed the grand jury about David Smollar. Here is the entirety of what he said: "The final note that I would make in explanation of the evidence is that there—we did not call the witness David Smollars [*sic*] to testify. He has been described in many different ways by different witnesses as basically the whistle-blowing ex-employee who first provided the newspapers and the public with a copy of the list, the first list that was made in 2005. Although Dr. Fleming, through his attorneys and the *Johnson* documents, had made several mentions about Mr. Smollars, it's important to note that his testimony was not integral to the proof of these crimes. His testimony, his

credibility or lack of credibility really is insignificant and not relevant to this case. He did not testify, and *anything that he might say or not say is not relevant to the crimes at this point.* In other words, for purposes of the indictment, I believe that the testimony and the documents you've received is sufficient for each of the counts, 1, 2, 3 and 4 of the indictment." (Italics added.) Count 4, to reiterate, was the perjury count against McGill.

## IV. LITIGATION HISTORY

### A. *At the Trial Level*

On May 14, 2007, the grand jury returned an indictment that named both superintendent Fleming and assistant superintendent McGill as defendants. McGill was charged with conspiracy and perjury; the trial court's order dismissing the conspiracy count is now final. While McGill's arraignment took place on July 13, 2007, McGill did not make a motion under section 995 to dismiss the charges against her until March 19, 2010. (We discuss the obvious timeliness issue in pt. VI.E. below.) The trial court heard McGill's motion in early April 2010, denied it, and McGill filed this writ proceeding in mid-April.

### B. *At the Appellate Level*

McGill's petition to this court came close on the heels of superintendent Fleming's petition considered in *Fleming, supra,* 191 Cal.App.4th 73, but clearly implicated a different set of legal issues.[17]

■ This writ proceeding, after all, centers on allegations of *perjury*, not the alleged misuse of public funds. Perjury has certain elements, two of which are that the untrue statement under oath be both (1) material and (2) knowingly made. (*People v. Garcia* (2006) 39 Cal.4th 1070, 1091 [48 Cal.Rptr.3d 75, 141 P.3d 197] [recounting elements of perjury as " 'a "willful statement, under oath, of any material matter which the witness knows to be false" ' "].)

After oral argument in December 2010, many questions remained unanswered, particularly about whether the *process* by which the grand jury indicted McGill for perjury was fundamentally fair. In order to give the parties a chance to express their views on these questions, this court sent out several requests for supplemental briefing.

---

[17] Except of course for the conspiracy count (count 3 in the joint indictment) which McGill shared with Fleming. That trial court's dismissal of that count, as noted above, was affirmed in *Fleming.*

And then, in early May 2011, in response to the second round of supplemental requests, came a request for judicial notice that appeared to be a bombshell. Up to that point, the district attorney's office had assured this court, in no less than three separate sets of briefs filed in this court, that it had not been in possession of any exculpatory evidence from Smollar.[18] And we were prepared to accept that assurance.

But then came McGill's request for judicial notice of the affidavit of an investigator for the district attorney's office used to support a search of the offices of the Capistrano Unified School District in August 2006, just before the grand jury began its investigation by calling McIntyre and Smollar. The affidavit contained an account of a conversation between the investigator and Smollar in which Smollar gave the investigator a scenario in which, at the very least, Smollar himself had directly transmitted to Fleming at least part of the January 12, 2006 document.

In the words of the investigator recounting the conversation with Smollar: "*McGill told Smollar* to write those names down *and generate a list* (see attachment H) *to give to Fleming*. Smollar provided me [(the investigator)] the original hand written list. *Smollar wrote each name by hand, and he said he brought that list back to his CUSD office. Smollar later transferred the list of names into a computer and generated a final list for Fleming* (see attachment I)." (Italics added.)

Attachments "H" and "I," referenced in the affidavit, are identical to the "simple lists" that make up what we have called "part 2" of the January 12, 2006 memo.

The investigator's statements were "reviewed" by one of the two prosecutors who conducted the grand jury hearing. The affidavit thus *looked* like the

---

[18] In the return to petition for writ of mandate, filed in this court by the district attorney's office on September 9, 2010: "Finally, there is no indication that Smollar's testimony would have been exculpatory vis a vis petitioner [(McGill)]. At best, he might have testified that petitioner did not personally write down any signature-gatherer names."

In the real party in interest's supplemental brief re: petition for writ of prohibition/mandate filed in this court by the district attorney's office January 28, 2011: "While the evidence did establish that Smollar was instrumental in writing down the names of the recall petition signature gatherers at the Registrar's Office, there was no evidence that he participated in *or was aware of the creation of the typed lists by McGill's secretary, Barbara Thacker, which were the lists attached to McGill's January 12 memo to Fleming.*" (Italics added.)

In the real party in interest's answer to petitioner's supplemental brief filed in this court by the district attorney's office on February 28, 2011: "Not surprisingly, McGill argues the prosecutor's statement to the grand jury that '[David Smollar's] testimony, his credibility or lack of credibility really is insignificant and not relevant to this case,' contravened Penal Code section 939.7, *even though the prosecution had no knowledge that Smollar possessed any specific exculpatory evidence.*" (Italics added.)

district attorney's office had, at the very least, withheld evidence of some exculpatory value from the grand jury, and, even perhaps had misled this court by assuring it that the office had never had any exculpatory evidence from Smollar in its possession, when in fact it had such exculpatory evidence. On the surface, it looked bad.

Rather than just proceed with the record then at hand, we gave the parties the opportunity to comment, expressing our concern that we were *reluctant* to conclude that the district attorney's office had concealed exculpatory evidence from the grand jury (and what's more, the trial court and this court). We have received the district attorney's office's explanation.[19] The district attorney's office's explanation was thorough, and presented to this court these revelations about the case:

—The district attorney's office made a "tactical decision" not to call Smollar before the grand jury. That "tactical" decision appears to have two components. First, *Fleming's* attorney—and Fleming was the original target of the grand jury investigation—had written to the district attorney's office and asserted that there were no less than eight potential witnesses who could "testify with respect to the District's protracted problems with Mr. Smollar."

[19] Under *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 654 [183 Cal.Rptr. 508, 646 P.2d 179] (*Flaherty*), when an appellate court considers sanctions on appeal, the party to be sanctioned must be given "fair warning." As *Flaherty* explains, the notice is required by, if nothing else, the "rudiments of fair play." (*Ibid.*; see also Cal. Rules of Court, rule 8.276(c) [requiring "notice in writing"].) This court's inquiry here was directed at what *appeared* to be the subjective bad faith of the district attorney's office in making an argument to this court (namely, asserting on appeal that the district attorney's office did not know Smollar had or possessed any exculpatory evidence, when in fact it did know of such evidence). When appellate courts consider sanctions for subjective bad faith on appeal, they may solicit, and certainly may consider, declarations from the party to be sanctioned. (See generally *San Bernardino Community Hospital v. Meeks* (1986) 187 Cal.App.3d 457 [231 Cal.Rptr. 673] (*San Bernardino Community*).) In response to our notice, the district attorney's office here submitted two declarations, one from the appellate deputy who has been tasked with writing the briefing in this writ proceeding, and the other from one of the two trial-level deputies who conducted the grand jury investigation. Attached as exhibits to the latter's declaration were various documents relating to the grand jury investigation, all either submitted to the grand jury directly (e.g., Judge Waldrip's report) or part of the district attorney's office's own file (e.g., letters to the office from Fleming's attorney) which in theory would have been available to be made part of the exhibits supporting McGill's original section 995 motion in the trial court.

As a matter of technical appellate procedure, we dispose of the district attorney's office's declarations and supporting exhibits this way: We *consider* the declarations of both the appellate deputy and the trial deputy as relevant to the question of appellate sanctions pursuant to *San Bernardino Community*. We *deem* those portions of the trial deputy's declaration authenticating the exhibits to be, substantively, an implied request to this court to take judicial notice of various documents which came from either the prosecutor's own file and which were thus available to support the trial-level section 995 motion, or which were part of the record of the grand jury's investigation in any event. As such, we grant the implied request for judicial notice of those documents.

Second, apparently on its own, the district attorney's office determined that Smollar was a bad witness who "held a grudge" and had a "built-in bias" against the school district.

In August 2006, a retired Orange County Superior Court judge, Stuart Waldrip, had been asked by the school district's legal counsel to conduct an independent investigation of allegations of misconduct by district officials, including "hit list" (to use Judge Waldrip's words) allegations based on the lists compiled on the January 2006 trip to the registrar. In the course of his investigation, it was Judge Waldrip who discovered the January 12, 2006 memo, complete with spreadsheets, and he sent it along to the district attorney's office about September 14, 2006. That is, the district attorney's office did not receive the January 12, 2006 memo until after McGill had finished testifying before the grand jury. During that investigation, Judge Waldrip *did* ask McGill about the January 12, 2006 memo, and she "had no recollection of the memo or the lists and spread sheets attached, whatsoever." However, McGill *did* "confirm the authenticity of the documents" apparently acknowledging that the squiggle by her name was indeed hers.[20]

—The district attorney's office (and we will add, to its great credit) gave the Waldrip report to the grand jury as part of the exhibits for it investigation.[21]

—The grand jury was not given the spreadsheets—what we have called "part 3" of the January 12, 2006 memo. Instead, it received part 1 (the cover memo) and part 2 (the "simple lists").

The basic argument presented by the district attorney's office's response is that the investigator's affidavit was not exculpatory after all. In part VI.C. below we deal with the merits of this argument.

In our request, we also raised the question of whether appellate sanctions might be in order given that the district attorney's office's briefing to this court had constantly reassured us that it had no exculpatory evidence in its possession from Smollar at the time it asked the grand jury to indict McGill for perjury. (Here is a secret: earlier drafts of this opinion were based on the assumption that nothing Smollar even might have said was directly exculpatory of McGill.) In part VII.B. below we deal with the question of whether appellate sanctions are warranted.

---

[20] As regards the Smollar-McGill trip to the registrar's office, Judge Waldrip was somewhat critical of the *registrar*. The registrar's conduct was "imprudent and illegal" in permitting school district personnel to have access to the petition forms, but was ultimately "innocent."

According to Judge Waldrip's report, Smollar declined all invitations to speak with him.

[21] Why in the world McGill's attorney did not include the Waldrip report among his initial filing of exhibits in support of the section 995 petition is not readily apparent.

And with that we now turn to the merits of the issues addressed.

## V. THE PROTECTIVE ROLE OF THE GRAND JURY

 The subheading immediately above—emphasizing that the role of the grand jury is *protective*—is lifted straight from the majority opinion of the Supreme Court in *Johnson, supra*, 15 Cal.3d at page 253, a majority opinion which emphasized the grand jury's role as a " 'protective bulwark standing solidly *between* the ordinary citizen and an overzealous prosecutor.' " (*Ibid.*, italics added, quoting *United States v. Dionisio* (1973) 410 U.S. 1, 17 [35 L.Ed.2d 67, 93 S.Ct. 764].) And indeed, Justice Clark's opinion for the *Johnson* majority would quote the language from *Tyler* that a grand jury should "never forget" that it "sits as the great inquest between the State and the citizen." (*Johnson, supra*, 15 Cal.3d at p. 254, quoting *Tyler, supra*, 64 Cal. at p. 437.)

A short history lesson is in order, because the history of the grand jury as it comes down to us in California today is, for the most part, an elaboration on the theme that the reason we have grand juries in California in the early 21st century is to act as an independent buffer between citizens and overzealous prosecutors.

*1166 and all that*: The grand jury system began in England during the reign of Henry II (of "will no one rid me of this turbulent priest?" fame), and is usually traced to something called the "Assize of Clarendon" in 1166. (See *Johnson, supra*, 15 Cal.3d at p. 257 (conc. opn. of Mosk, J.).)[22] As originally formulated, grand jury procedure was nothing less than "barbaric" (Justice Mosk's word (see *ibid.* (conc. opn. of Mosk, J.))). If you were "indicted" (by 12 knights who decided who was suspected of "public offenses"), you had to undergo trial by ordeal. (*Ibid.*) The United States Supreme Court would later note in *Hurtado v. California* (1884) 110 U.S. 516 [28 L.Ed. 232, 4 S.Ct. 111] (*Hurtado*) that the ordeal was a trial by water. The bad news: If you didn't pass the trial, you lost a hand and foot, and were banished. The good news: If you passed the trial by water, you were only banished. (*Id.* at p. 530.) The *Hurtado* court characterized the early grand jury as a "primitive" procedure where mere accusation was " 'practically equivalent to a conviction.' " (*Ibid.*)

*Adoption by the American colonies and later by California*: Obviously, we would not have grand juries in modern California if something had not changed. That change was the gradual evolution of the grand jury as an

---

[22] To the degree that Americans are familiar with "assizes," we tend to think of them as courts. (The word comes from the Old French meaning "to sit.") But an "assize," as in "the Assize of Clarendon," can also refer to a decree issued *by* a court. (See generally 1 Oxford English Dict. (2d ed. 1989) p. 716.)

institution in England where, by the late 1600's, grand juries regularly stood up to the Crown and *refused* to indict persons whom the Crown wanted indicted. (See *Johnson, supra*, 15 Cal.3d at p. 258 (conc. opn. of Mosk, J.) [noting refusal to indict the Earl of Shaftesbury in 1681[23]].) That tradition of grand jury independence was carried over into America in colonial times, where such things as the refusal of grand juries to indict the instigators of the Stamp Act riot in 1765 and a 1770 Philadelphia grand jury report proposing protests against increased taxes on tea endeared the grand jury as an institution to the new nation. (Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 518.)

The same tradition of independence was responsible for California's adoption of the grand-jury-indictment system, first in the state Constitution of 1849 and then culminating in the Constitution of 1879. (See *Hawkins, supra*, 22 Cal.3d at p. 611 (dis. opn. of Richardson, J.); Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 519 [noting that "California's grand jury system was born . . ." out of a "pre-Civil War tradition" as an independent watchdog].)

Of course, at the same time (that is, the time of the new Cal. Constitution of 1879) California was also developing the complaint-preliminary hearing-information procedure. Remarkably, at that time, some defendants thought that the grand-jury-indictment procedure afforded them *more* protection than the newfangled preliminary hearing procedure. In *Kalloch v. Superior Court* (1880) 56 Cal. 229 (*Kalloch*), and in *Hurtado, supra*, 110 U.S. 516, defendants in murder cases challenged their prosecutions (in *Kalloch*, it was a motion to set aside the information; in *Hurtado* it was a full murder conviction and the defendant was facing execution) under the complaint-preliminary hearing-information procedure. Both defendants thought that going by way of preliminary hearing wasn't quite up to "due process of law," with its roots in Magna Carta, under the Fourteenth Amendment to the federal Constitution. Both the California and United States Supreme Courts rejected each challenge. The emphasis of our state high court in *Kalloch* was that the preliminary hearing procedure was *just as good* as the grand-jury-indictment procedure. What, after all, had the defendant to complain about? Said the *Kalloch* court: "It may be questionable whether the proceeding by indictment secures to the accused *any superior rights and privileges*; but certainly a prosecution by information *takes from him no immunity or protection to which he is entitled under the law*. But the Constitution of this State has made provision for this form of prosecution, and the Legislature has furnished the machinery to enforce it. In our opinion, the proceeding is a legal and constitutional one." (*Kalloch, supra*, 56 Cal. at p. 241, italics added.)

---

[23] He was a Protestant Whig patron of John Locke, and the charge against him was treason against Charles II. The charge was the result of a Tory reaction in the early 1680's.

The *Hurtado* case was even more remarkable, since it represents a riff on the theme of "be careful what you ask for." The *Hurtado* opinion is replete with references to Magna Carta. After recounting how, in the wake of the Assize of Clarendon, a grand jury indictment was "practically equivalent to a conviction" (see *Hurtado, supra*, 110 U.S. at p. 530), the Supreme Court wryly noted: "When we add to this that the primitive grand jury heard no witnesses in support of the truth of the charges to be preferred, but presented upon their own knowledge, or indicted upon common fame and general suspicion, we shall be ready to acknowledge that *it is better not to go too far back into antiquity* for the best securities for our 'ancient liberties.' " (*Hurtado, supra*, 110 U.S. at p. 530, italics added.) That is, the federal Supreme Court was saying (particularly in regard to the good old days of 1215 when Magna Carta was signed) that *American* due process was not a matter of the bad old days of 1166 when the indictment of 12 knights was as good as a conviction.

*Regression and correction*: The next century, however, would see, at least in the perception of a number of jurists—mostly notably the late great Stanley Mosk—a "regression" from the " 'strong independent power guarding the rights of the English people' " which had led California to adopt the grand jury system in the first place, to being "little more than a convenient prosecutorial tool." (*Johnson, supra*, 15 Cal.3d at pp. 258–259 (conc. opn. of Mosk, J.), quoting Younger, The People's Panel: The Grand Jury in the United States, 1634–1941 (1963) p. 2.)[24]

A course correction was necessary to reemphasize grand jury independence, and that course correction was made by the California Supreme Court majority in *Johnson*. We will discuss the facts in *Johnson* in detail in part VI.A. below. For the moment, suffice to say that things went a bit unusually in *Johnson*. First, there was a preliminary hearing. And the unexpected happened at the preliminary hearing: The defendant's own testimony at the preliminary hearing led the magistrate, resolving conflicts in favor of the defense, to dismiss the charge. Undaunted, the local district attorney thereafter presented the case to the grand jury but did not tell the grand jury about the testimony that had led the magistrate to dismiss the case in the first place. (*Johnson, supra*, 15 Cal.3d at p. 250.) Reasoning that the grand jury could not be "expected to call for evidence of which it is kept ignorant," the *Johnson* court (and all members of the court agreed with *at least this*) concluded that section 939.7—with its provision that the grand jury *must* order the production of evidence "when it has reason to believe" that "other

---

[24] See footnote 26 below, for an indication of how widespread Justice Mosk's perception was.

evidence within its reach will explain away the charge"—had been violated. (See 15 Cal.3d at pp. 250–251.)[25]

Justice Mosk, joined by Justice Wright, wrote separately to argue that the absence of a preliminary hearing procedure for *indicted* defendants—as distinct from those against whom an information had been filed—violated constitutional guarantees of equal protection. His concurring opinion was clearly a labor of considerable historical scholarship—it was he who first introduced the Assize of Clarendon and the Earl of Shaftesbury to the official California reports—and Justice Mosk's concurrence in *Johnson* should probably be required reading of all lawyers who would aspire to work as prosecutors in California. (See *Johnson, supra,* 15 Cal.3d at pp. 257–261 (conc. opn. of Mosk, J.).) Justice Tobriner opined that the "serious constitutional questions" raised in the case should "await" another case. (*Id.* at p. 270 (conc. opn. of Tobriner, J.).)

That other case came three years later, when the California Supreme Court decided *Hawkins, supra,* 22 Cal.3d 584. Obviously taking a page from Justice Mosk's concurrence in *Johnson*, a group of defendants who had been indicted by the San Francisco Grand Jury for conspiracy and grand theft made a motion for dismissal or, alternatively, a postindictment preliminary hearing. (*Id.* at p. 586.) That teed up the issue for the Supreme Court, which held that the state Constitution's equal protection clause required such a hearing. (See 22 Cal.3d at pp. 593, 595.) Essentially, the high court compared the protections afforded defendants under the complaint-preliminary hearing-information procedure with those afforded under the grand-jury-indictment procedure. There was a big "disparity" between the two. (*Id.* at p. 587.) And that disparity simply could not pass state constitutional muster (see *id.* at pp. 592–593). Along the way, the *Hawkins* court lamented the "institutional schizophrenia" in modern grand jury practice (*id.* at p. 591) borne of its role (in criminal cases) of being both "accuser and impartial factfinder" (*ibid.*). The high court majority also worried (and that's a mild word when you read the *Hawkins* majority opinion as a whole) about the "pervasive prosecutorial influence" in modern grand jury practice. (*Id.* at pp. 589–591.)

[25] The *Johnson* majority opinion was written by Justice Clark, with Justices McComb, Tobriner, Sullivan and Burke concurring. The other two justices were Chief Justice Wright and Justice Mosk. Justice Mosk wrote separately, certainly agreeing with the majority's point that the prosecutor had a duty to disclose the existence of the exculpatory testimony by the defendant (*Johnson, supra,* 15 Cal.3d at p. 255 (conc. opn. of Mosk, J.)), but asserting that the court should have gone further and concluded that the accused was entitled, as a matter of constitutional equal protection, not to be bound over for trial without a preliminary hearing (*id.* at p. 267). Chief Justice Wright joined Justice Mosk's concurring opinion. Justice Tobriner (who concurred in Justice Clark's majority opinion) wrote separately to note that the case raised "serious constitutional questions" but those questions should "await" another case. (*Id.* at p. 270 (conc. opn. of Tobriner, J.).)

Justice Richardson, joined by Justice Clark, the author of the *Johnson* majority opinion, dissented in *Hawkins*. His theme was that the grand-jury-indictment process was embedded in the California Constitution, and that it was the *Legislature*, not the judiciary, that had been "vested with the *exclusive* power to alter or abort" the grand jury system. (*Hawkins, supra*, 22 Cal.3d at p. 612, original italics.)

*Proposition 115*: In the wake of *Hawkins*, preliminary hearings were required in all felony cases where the accused was indicted by a grand jury. But Justice Richardson's position on the lack of any entitlement of indicted persons under the state Constitution to a preliminary hearing would ultimately prevail. In 1990, the electorate adopted Proposition 115. Proposition 115 added section 14.1 to article I of the California Constitution. Section 14.1 consists of one, admirably direct, sentence: "If a felony is prosecuted by indictment, there shall be no postindictment preliminary hearing."

A year after Proposition 115, there would be one last attempt, in *Bowens, supra*, 1 Cal.4th 36, to insert a preliminary hearing requirement into the grand-jury-indictment procedure. As against a full-on attack based on the *federal* equal protection clause, the *Bowens* majority reasoned that the matter was reviewable under a rational basis standard, and, on such a standard, the denial of preliminary hearings to indicted defendants was quite reasonable, including (as we ourselves have noted above) the state's legitimate interests in protecting the privacy of innocent persons and deterring flight from the jurisdiction. (1 Cal.4th at p. 43, fn. 3.) As against a sideways argument to the effect that, despite the plain language of California Constitution article 1, section 14.1, a harmonization of section 14.1 with the intact state equal protection clause (Cal. Const., art. I, § 7) required a " 'quasi-preliminary hearing' " for indicted defendants (*Bowens, supra*, 1 Cal. at p. 46), the *Bowens* court said no: Such a "quasi" procedure simply ran afoul of the plain text of the article. (See *ibid.*)

Justice Mosk dissented in *Bowens*, arguing that there was still a violation of the state equal protection clause after Proposition 115 not to give indicted defendants a preliminary hearing. (*Bowens, supra*, 1 Cal.4th at pp. 52–56 (dis. opn. of Mosk, J.).)

*The Legislature's last major visit*: But there was still one more major development in California grand jury procedure to come. While it is some-times remarked that section 939.71 was a "codification" of the *Johnson* majority decision (for one thing, subd. (b) of § 939.71 says exactly that), what is less often noticed is the relatively long gap between the two—23 years. *Johnson* was decided in 1975. Section 939.71 was not enacted by the Legislature until 1998.

Ironically, section 939.71 arose out of a grand jury investigation and indictment initiated by the Orange County District Attorney's Office though—we hasten to add—in a prior administration. As recounted by Professors Vitiello and Kelso, in 1996 the office obtained a four-count felony indictment against a member of the California Assembly (plus 18 misdemeanor counts) for allegedly falsifying campaign records during a special election held the previous year. But the trial court threw out most of these charges because the prosecutor had not introduced exculpatory evidence, and even after refiling, the matter ended with the Assembly member simply paying civil fines for nine violations of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.). (Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 547.) Undoubtedly soured by his experience with grand jury procedure, the Assembly member introduced the bill that eventually became section 939.71. We will compare and contrast section 939.71 with section 939.7 below. For the moment, however, it is enough to note that the focus of section 939.71 is on *prosecutorial* awareness of "exculpatory evidence" (the statutory word), while the focus of section 939.7 is on the *grand jury's* own duty to "order the . . . produc[tion]" of evidence which the grand jury "has reason to believe . . . will explain away the charge."

*Summary of what the history shows us*: Several firm lessons emerge from our canvass of the history of grand jury procedure:

One, the main reason we still have grand juries in criminal matters is because grand juries are supposed to play a "protective role" between the citizen and potentially overzealous prosecutors. From *Kalloch* and *Hurtado*, to about a hundred years later in *Johnson*, the California Supreme Court has seen grand juries as important *buffers* between persons accused of crime and prosecutors.

Two, the California Supreme Court has never embraced the idea that the grand jury *should* be a "rubberstamp" of the prosecutor. Rather, in the *Johnson* case the court was unanimous that the grand jury *should* operate as an independent bulwark between the citizen and overzealous prosecutors. Indeed, no member of the high court, nor action by the electorate, has ever repudiated the idea of grand jury independence. One will certainly not find any repudiation of the idea in Justice Richardson's dissent in *Hawkins* or in the one-sentence addition of section 14.1 to article I of the Constitution brought about by Proposition 115.

Three, a significant portion of California's high court, including two justices in *Johnson* and five in *Hawkins*, have been explicit in their dismay over, as the *Hawkins* majority put it, "pervasive prosecutorial influence" over grand juries. (*Hawkins, supra*, 22 Cal.3d at p. 590.) What tension there has

been in our high court's jurisprudence has not been over what grand juries *ought* to be, but what, in practice, they *are*. In *Hawkins*, a majority of the Supreme Court took the view that, by the late 1970's, grand jury independence had become a "fiction." (*Hawkins, supra*, 22 Cal.3d at p. 590.) For example, the *Hawkins* majority opinion is often cited for its colorful line that "current indictment procedures create what can only be characterized as a prosecutor's Eden: he decides what evidence will be heard, how it is to be presented, and then advises the grand jury on its admissibility and legal significance." (*Id.* at p. 592; see Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 578 [citing "Eden" line].)

The "Eden" line from *Hawkins* might be itself characterized as the "ham sandwich" view of modern grand jury procedure, a view which, alas, is not without substantial juridical support around the country beyond the *Hawkins* majority. One can find no less than a dozen and a half published cases around the United States that repeat the maxim that a grand jury would indict a ham sandwich if asked to by a prosecutor.[26]

But let us take a moment to be clear: As an intermediate appellate court, we do *not*, in our opinion today, rely on or adopt the "ham sandwich" view of grand jury procedure. Our decision today, rather, is grounded on the more idealistic view of grand juries expressed by Justice Clark for the *Johnson* majority, namely that grand juries are *supposed* to play a protective, buffer role, and on the *Johnson* court's recognition that courts should examine grand jury proceedings so as to ensure the grand jury's independence. (Accord, *People v. Backus* (1979) 23 Cal.3d 360, 392 [152 Cal.Rptr. 710, 590 P.2d 837] (*Backus*) [stressing that "the obligation of the prosecutor to assure independence, procedural regularity, and fairness in grand jury proceedings is compelled by due process . . ."].)

---

[26] The "ham sandwich" line, at least as it appears in the cases, can be traced back to a comment by the chief justice of New York State's highest court (the equivalent of its supreme court), though, interestingly enough, the chief justice appears to have been first quoted in Tom Wolfe's novel, The Bonfire of the Vanities (1987). The quote appears to have been first picked up in a published opinion by the West Virginia Supreme Court, in *Kerns v. Wolverton* (1989) 181 W.Va. 143, 147, fn. 4 [381 S.E.2d 258, 262] ["Tom Wolfe reflected on this perception in his novel *The Bonfire of the Vanities*: 'Grand-jury hearings had become a show run by the prosecutor. With rare exceptions, a grand jury did whatever a prosecutor indicated he wanted them to do. Ninety-nine percent of the time he wanted them to indict the defendant, and they obliged without a blink. They were generally law-and-order folk anyway. They were chosen from long-time residents of the community. Every now and then, when political considerations demanded it, a prosecutor wanted to have a charge thrown out. No problem; he merely had to couch his presentation in a certain way, give a few verbal winks, as it were, and the grand jury would catch on immediately. But mainly you used the grand jury to indict people, and in the famous phrase of Sol Wachtler, chief judge of the State Court of Appeals, a grand jury would "indict a ham sandwich," if that's what you wanted.' "].)

We also find persuasive—and this is *not* an irony—the view inherent in Justice Richardson's dissent in *Hawkins* to the effect that the protections afforded citizens vis-à-vis grand juries *by the Legislature* are adequate to ensure that the grand jury process be fair. The Legislature has, as we are about to see, provided more protections to citizens in grand jury procedure than are commonly realized. Of course it is up to the courts to enforce those statutory protections, as we will now proceed to do.

## VI. APPLICATION OF THE GRAND JURY'S PROTECTIVE ROLE TO THIS CASE

### A. *Incorrectly Instructing the Grand Jury About the Relevance of Smollar's Testimony*

As recounted, the prosecutor who instructed the grand jury told them that "we" (meaning the prosecutors themselves, as distinct from the grand jurors) did not call David Smollar and, further, affirmatively instructed the grand jurors about Smollar that "anything that he might say or not say is not relevant to the crimes at this point." The "point" to which the prosecutor was referring was, of course, the point in time just prior to the grand jury's deliberation as to whether it should indict McGill for perjury.

In this writ proceeding, the district attorney's office makes no effort to argue that the substance of the instruction about Smollar was correct, i.e., that *anything* Smollar *might* have said to the grand jury was indeed *not relevant* to the question of whether the grand jurors should indict McGill for perjury. And, of course, it is undeniable that much of what Smollar might have had to say would have been quite "relevant" to the question of whether McGill had committed perjury. Rather, as later conceded by the district attorney's office in its supplemental briefing, the main reason that Smollar had not been called as a witness was that he had an obvious chip on his shoulder and the district attorney's office wanted to "prove the case independent" of his testimony.

But we must remember—*this* is a perjury case, against McGill, and not the misuse-of-public-funds case that the grand jury was originally called to investigate. And to repeat again, without a false statement that is *knowingly made*, there is no perjury. (*People v. Garcia, supra,* 39 Cal.4th at p. 1091.)

Let us now note the obvious: The actual cover memo of January 12, 2006 (what we have called "part 1"), was itself short, and nonsubstantive. It consisted of two sentences, simply forwarding on a list "per" superintendent Fleming's "request." It is a stretch to dignify the January 12, 2006 cover memo itself as a "report." The cover memo is so short and perfunctory that it

could easily have been forgotten (education administrators are forever writing memos to each other!), or not have been remembered as a "report."

Readers who have slogged through part III. of this opinion may remember how hesitant McGill's secretary, Thacker, was in identifying the cover memo as authored by McGill. Words practically had to be put into her mouth to get her to link McGill to the document.

Then there was the whole, otherwise uncontroverted story, of the events leading to the creation of the attachment behind the January 12, 2006 memo, and the memo's subsequent appearance, about a month after McGill had completed her August 2006 testimony, in *Smollar's* "things." Nobody disputed that Smollar accompanied McGill to the registrar's office and Smollar himself copied down the names that made up the lists.

Further, the investigator's affidavit clearly showed that Smollar himself was the person who typed up the two "simple" lists that we have called "part 2" of the January 12, 2006 memo.

Under such circumstances, even apart from any Smollar-did-it forgery theory, it is a logical inference that Smollar would have had a considerable amount to say about the *chain of transmission* of the January 12, 2006 memo. At the very least he was present at the creation of the two simple lists that made up part 2 of the January 12, 2006 memo. It was those two simple lists which were the basis for the preparation of the more detailed spreadsheets that we have called "part 3." Also, Smollar would have been able to testify that *he* wrote the entire list of names, he typed them up and he put them into some sort of word processing form which became the "simple" lists, and *he* then gave those lists to Fleming. Smollar probably also would have been able to testify as to how the two simple lists, the spreadsheets *and* the short cover memo, ostensibly from McGill to Fleming, ended up in *his* "things." In short, other than McGill and Thacker, Smollar was the most relevant witness imaginable as to the role McGill had, if any, in the preparation of the January 12, 2006 memo.

According to the district attorney's office, however, denying the grand jury *relevant*—and in the case of McGill's perjury charge, highly relevant— testimony is not sufficient to show a violation of section 939.7. In this writ proceeding the district attorney's office takes the view that because the office was not *aware* that Smollar would have said anything directly exculpatory, the instruction that told the grand jury *in effect* not to use its own independent power to call Smollar as a witness was proper.

We must, however, reject that view, if for no other reason than it is contrary to what our Supreme Court said in *.Johnson.* There, interestingly

enough, qualitatively the same thing happened: The prosecutor also, in practical effect, caused the grand jury to refrain from even *inquiring* about potential exculpatory evidence.

Now to the nitty-gritty facts in *Johnson*. In *Johnson*, the accused was arrested on a drug dealing charge based on a deal which his supposed "partner" had purportedly consummated with an undercover narcotics agent in a Stockton hotel room in August 1973. According to the prosecution's evidence at the preliminary hearing, the accused had entered into the transaction with the undercover agent in July. However, at the preliminary hearing, the accused testified that, in connection with an earlier drug charge back in March, he had made an agreement with a particular deputy district attorney for leniency in return for information that would lead to the arrest of other drug dealers. And in that connection, the accused readily admitted to entering into a transaction with the undercover agent in July, but with the intention of "informing" on the agent (and the agent's informant). Moreover, the accused testified that he never said anything in the July transaction about using his supposed partner as an intermediary, and had nothing to do with the partner's eventual delivery of drugs to the undercover officer and the officer's informant in the Stockton hotel room. (*Johnson, supra,* 15 Cal.3d at pp. 251–252.)[27]

At the preliminary hearing, the magistrate resolved the conflicts in the evidence against the prosecution and dismissed the case. (It didn't help, as the *Johnson* court pointed out, that the prosecution did not call the deputy district attorney with whom the accused had claimed to have made the previous deal (see *Johnson, supra,* 15 Cal.3d at p. 252).) However, at a subsequent grand jury hearing, the prosecutor never informed the grand jury about the accused's testimony at the preliminary hearing (i.e., that the accused had a deal with the district attorney to be an informant), and *furthermore* "created the false impression" that the accused "would refuse to testify if called" by having the arresting officer testify that the accused had refused to make a statement to that officer at the time upon the advice of his counsel. (*Id.* at p. 253.)

The *Johnson* majority was not amused. They said that not only was the reference to the accused's right against self-incrimination "clear misconduct" on the prosecutor's part, but, "more importantly," the prosecutor had

---

[27] The appellate-level deputy tasked with defending the grand jury proceedings here observes, in a supplemental brief filed January 28, 2011, that in his more than 23 years of practice as a prosecutor, he "has never heard of a defendant testifying on his own behalf at a preliminary hearing." Well, as *Johnson* shows, it happens sometimes.

"thwarted" the "grand jury's power to order the production of evidence which may 'explain away' the charges under consideration." (*Johnson, supra,* 15 Cal.3d at p. 253.)[28]

To be sure, on its face the accused's testimony at the preliminary hearing in *Johnson* was directly exculpatory, whereas here the district attorney's office disputes the idea that anything Smollar might have said would have been exculpatory *on its face.* Let us assume the district attorney's office's premise to be true for the moment. Even so, it is the grand jury that is the judge of credibility in this context, and the grand jury has the right to draw its own conclusions about witnesses beyond the *face* of their testimony. Body language, or anger in tone or facial expression, might very well persuade a grand jury that, in its own "judgment," one witness was out to "get" another and could not be trusted.

Thus in *Johnson*—as that "more importantly" quoted above reveals—the high court was not *just* concerned with the *prosecutor's* state of mind. Nor was the high court just concerned about the exculpatory *qua* exculpatory quality of the accused's testimony at the preliminary hearing. The high court was *also* clearly concerned with the grand jury's own independent duty to evaluate witness credibility so as to fulfill *its duty* under section 939.7 to order the production of evidence if that evidence *could lead* to the explaining away of the charge.

A variation on the theme of the duty of prosecutors not to cause grand jurors to avoid evidence naturally suited to their inquiry may also be found in *People v. Gnass* (2002) 101 Cal.App.4th 1271 [125 Cal.Rptr.2d 225] (*Gnass*), where incomplete instructions about a crime resulted in the dismissal of the indictment.

In *Gnass*, a city attorney was indicted for having a financial interest in each of 10 contracts the city made in connection with the issuance of bonds. The city attorney also served as private attorney for a technically separate joint powers agency. And the agency would need a "disclosure counsel"—a lawyer who evaluates risks and prepares a prospectus for potential investors. (See *Gnass, supra,* 101 Cal.App.4th at pp. 1279–1282.) The appellate court noted that the city attorney's role in the whole bond deal was somewhat "unclear," but the basic idea of the indictment was that the city attorney had "used his position as the [c]ity [a]ttorney" to convince the separate joint powers agency

---

[28] But again just to be clear: We do *not* believe that the trial-level deputy district attorney who told the grand jury that anything David Smollar might say was irrelevant committed any "misconduct." Being wrong is not misconduct. That said, he *did,* under *Johnson,* "thwart" the "power" of the grand jury given to it by section 939.7 to order evidence that could explain away the charges.

that was also his client to enter into the bond contracts, knowing *he* would also do the work of a disclosure counsel. (*Id.* at pp. 1282, 1288.)

Now, was that enough to make the city attorney "financially interested" in the 10 contracts? And did the city attorney "knowingly" and "willfully" cause contracts to be made in which he had a financial interest? The trial court didn't think so, and set aside the indictment. The People appealed. But the appellate court affirmed the dismissal of the indictment.

As to the "knowing" element, the *Gnass* court said that the district attorney's failure to instruct on the "knowing" and "willful" elements of any criminal conflict of interest meant the instructions given the grand jury were "in fact misleading." (*Gnass, supra*, 101 Cal.App.4th at p. 1306 ["Plainly, the district attorney did *not* instruct the grand jury on the "knowing" and "willful" elements that elevate a violation of section 1090 to a crime. . . . For reasons we will explain, we believe the instructions that *were* given were not simply incomplete, as the People contend, but were in fact misleading." (citations omitted)].)

■ A final few words are necessary about the point that Smollar was not anticipated to give any testimony which, on its face, seemed to the district attorney's office as being exculpatory of McGill. The key language in section 939.7 are the phrases "reason to believe" and "will explain away the charge." Those words convey a broader concept than the operative words in section 939.71, which are "exculpatory" and "aware." A comparison of the two statutes thus suggests that section 939.7 can encompass more than just testimony which, on its face, is "exculpatory."[29] The grand jury could have, by comparing the testimony of McGill with that of Smollar, made up its own mind as to the bona fides of the January 12, 2006 memo and whether McGill *knowingly* told an untruth in saying she never gave a "report" about the trip to the registrar to Fleming.

■ In *Berardi, supra*, 149 Cal.App.4th 476, 481, the appellate court found the requisite substantial prejudice to dismiss an indictment where a prosecutor's "disclosure to the grand jury" was "inadequate and inaccurate."

---

[29] In *Johnson*, the majority used the word "may" as in "may 'explain away' " the charge. (*Johnson, supra*, 15 Cal.3d at p. 253.) We know that the statute uses the phrase "will," as in "will explain away the charge." But statutes must be read as a whole: In the case of section 939.7, the duty imposed on the grand jury to "order the evidence to be produced" is a duty that comes into being after some evidence has already been produced (hence the reference to "other evidence"), but *before* the grand jury has actually heard or seen the "other evidence" which the grand jury "has reason to believe . . . will explain away the charge." Obviously, the grand jury can't be sure that the "other evidence" will, absolutely, explain away the charge until it sees it or hears it, so, for all practical purposes, the *Johnson* court's use of "may 'explain away' " was perfectly consistent with the statute.

As here, the "disclosure deficiencies seriously interfered with the grand jury's investigatory function, undermining its independence." (*Ibid.*) Examining the "record as a whole," the appellate court concluded that the grand jury "would not have found probable cause to indict had it been properly informed of the exculpatory evidence." (*Ibid.*) Because the court was left in " ' " 'serious doubt as to whether the error affected the result' " ' " (*id.* at p. 494, quoting *People v. Russell* (2006) 144 Cal.App.4th 1415, 1432 [51 Cal.Rptr.3d 263]), the *Berardi* court concluded there was substantial prejudice from an omission of an instruction concerning the element of a crime. (*Berardi, supra,* 149 Cal.App.4th at pp. 498–499.) The same reasoning applies here.

### B.　*Not Calling McGill Back to Explain the January 12, 2006 Memo*

█ Now back to section 939.7. As noted above, the statute fastens on the grand jury the affirmative obligation to order the production of evidence "within its reach" that will explain away the charge. The charge here is perjury, based on testimony McGill gave in August 2006, the only hard proof of falsity being a memo found *after* McGill had testified, and which she never got a chance to, literally, explain.

We have already noted a number of aspects of the memo. It was short. While the attachment might appear elaborate, it was simply derived from a list of names which, under the most unfavorable interpretation of Thacker's evidence, was based on a list given to Thacker by McGill. The exact words on which the district attorney's office appears to be basing the perjury charge against McGill was her two-word answer, "[t]hat's correct," to a prosecutor's question: "Then you never gave *any report about* the names you saw in there to Dr. Fleming, correct?" (Italics added.)

Let us leave aside for another day the question whether the January 12, 2006 memo—let's call it a "document" for the moment—was, as a matter of common sense or law—really a "report about the names" which were gathered at the registrar's office. We may certainly say that the nature of at least the cover memo is such that McGill may not have *reasonably considered* it a "report about the names" found at the registrar's office.

The district attorney's office posits that if McGill had been called back and confronted with the January 12, 2006 memo, she might easily have explained away her alleged perjury. We quote the relevant language from the district attorney's office's supplemental briefing in the margin, the gravamen of which is that witnesses can always explain away their lies, and therefore

interpreting section 939.7 to require grand juries to recall those witnesses to give them a chance to explain their alleged untruths would undermine grand jury "independence."[30]

■ The language is the legal equivalent of a Freudian slip. It betrays an assumption that the purpose of the grand jury proceeding was to obtain an indictment against McGill instead of fairly sorting out whether there was probable cause to indict McGill for perjury.[31] In fact, the language reveals an unstated "ham sandwich" premise, namely that grand juries *are and should be* the rubberstamps of prosecutors, so what good would it do if witnesses were called back and given a chance to "explain away" a possible perjury charge? The district attorney's office here forgets that the grand jurors themselves have *a right to make up their own minds* about a charge and, yes, if in their "judgment" the charge is not warranted (§ 939.8), refuse to indict.

---

[30] From the supplemental briefing filed February 28, 2011, all italics in original: "It was not a violation of section 939.7 for the grand jury not to have requested McGill to return to the grand jury to give her a chance to explain away the January 12 memo and attached lists. As we pointed out [in] Real Party in Interest's Supplemental Brief, the plain language of section 939.7 suggests the grand jury need not hear from a defendant under investigation even if she could explain away the charge were she called to testify. [¶] Moreover, . . . [T]he relevant inquiry is not whether the witness '*might* explain away the charge,' as McGill suggests on page 2 of her Supplemental Brief, but rather whether the grand jury "*has reason to believe that* [the witness] *will* explain away the charge[.] (§ 939.7, emphasis added.) There is always the possibility that a witness who has committed perjury might be able to explain away her lies. Indeed, the witness can always claim a failure of recollection or comprehension. But absent a new rule that would require the grand jury to recall any and all witnesses whom it accuses of committing perjury before it, there are no facts in this case to support the inference that the grand jury had 'reason to believe' McGill would have explained away the charge if she had been recalled to testify. The grand jury properly determined in their discretion that they did not need to hear anything further from McGill. [¶] Finally, a rule requiring the grand jury to recall any witness who has committed perjury during grand jury proceedings so that he or she can explain away the perjury charge would essentially require the grand jury to call every defendant in every case because there would almost always be reason to believe he or she might provide exculpatory evidence. After all, who is in a better position to explain away the charge than the defendant? The defendant could always come up with an explanation—whether true or not—that would exonerate him or herself. But such a rule would completely undermine the grand jury's independence."

Readers of this passage will note it contains an underlying assumption that grand jurors should be able to unilaterally determine that a witness has committed perjury *before them*, and bind that witness over for trial directly. We address that assumption in part VI.D. below.

[31] One should remember that at the time of the perjury indictment against McGill, the district attorney's office believed that it had a viable case against *Fleming* for misuse of public resources, but McGill's testimony stood in the way of the theory that Fleming, eager to use district resources to punish recall proponents, ordered McGill to obtain the names of the recall proponents from the registrar's office. A perjury indictment against McGill would necessarily put pressure on her to recant her story that the trip to the registrar's office was her own idea—readers can imagine how—and in any event would serve as a way of discrediting her as a witness favorable to Fleming.

 One caveat: Of course, we certainly do *not* adopt a blanket rule that any time a grand jury thinks a witness has lied it *must* recall that witness to give the witness a chance to explain away the alleged perjury. The "reason to believe" standard in section 939.7 is necessarily one which depends on the facts of a given case.

That said, under the peculiar circumstances of *this* case, *this* grand jury certainly had "reason to believe" that "other evidence" in the form of recalling McGill to confront her with the January 12 memo would have explained away the perjury charge. The bona fides of the January 12 memo were suspect, Thacker didn't remember McGill having given it to her, and Thacker only linked McGill to the memo after having been—"repeatedly asked the same question" if you don't like the word "badgered"—and even then the best the trial-level prosecutors could do was get a "probably" out of her. The January ·12 memo was found among the "things" of McGill's antagonist Smollar despite there being no "cc" on it to him. Moreover, the memo itself was short, substantively less a "report" than merely a forwarding of lists, and most of the actual work on the lists that a person might remember (for example, correlating names with school attendance areas) was clearly done by Thacker when she typed up the names. McGill could readily have forgotten about it, reasonably not have considered it a "report," or never seen the cover memo in the first place. And the grand jury had "reason to believe" she would have so testified. (At that point the grand jury would have had the right to make its own determination about McGill's explanation, and by no means would it have been required to believe it.)

## C. *Not Disclosing Exculpatory Evidence to the Grand Jury*

We now address the investigator's affidavit which only belatedly came to this court's attention in the course of supplemental briefing. The investigator's affidavit shows at least the following at the time a perjury indictment was sought against McGill:

—It was Smollar who wrote down the names and brought his own handwritten list back to *his* own office.

—It was Smollar *himself* who transferred the list *to a computer* and then generated the two "simple" lists we have described above.

—Smollar had given the "simple" lists, which formed what we have called part 2 of the January 12, 2006 memo, directly to Fleming.

—The two simple lists were at least one part of the January 12, 2006 memo on which the office was basing its perjury charge against McGill.

—The two "simple" lists which Smollar had prepared were the basis of the spreadsheets giving more information about the people on the list (the spreadsheets having themselves been prepared by means of some access to the district's database).

The affidavit thus showed that Smollar possibly had played a major role in the *real* work of the January 12, 2006 memo. He had done all the hand copying of the names. The names could easily have been given to Thacker, either by Smollar or McGill, and it was Thacker who would have done the tedious job of looking up each name and correlating it with certain information in the district database. McGill might simply have taken a report that genuinely originated in the hand copying of Smollar and the computer work of Thacker and simply passed it along to Fleming as part of many items in a day's work. A two-sentence cover memo would have been an easy matter to forget, which was consistent with McGill's reaction when shown the January 12, 2006 memo by Judge Waldrip.

Now, we are *not* saying that the grand jury necessarily had to believe such a scenario. This is not a substantial evidence case—the grand jury still might have indicted McGill for perjury. But it was entitled to have the chance to consider it.

In supplemental briefing, the district attorney's office states that the possibilities of simple forgetfulness, thinking that the cover memo was not really a "report," or forgery by Smollar were "clearly negated by the evidence presented to the grand jury."

 The assertion betrays a simple misunderstanding of a prosecutor's duties under sections 939.7 and 939.71, particularly in light of *Johnson* and Justice Richardson's dissent in *Hawkins*. Both authorities use the phrase "*reasonably tending to negate guilt.*" (*Johnson, supra*, 15 Cal.3d at p. 255, italics added; see *Hawkins, supra*, 22 Cal.3d at p. 619 (dis. opn. of Richardson, J.).) The question is not whether the prosecutor has substantial evidence of guilt, or that there is evidence that might reasonably tend to negate a defense. The question is whether the prosecutor has information that *reasonably tends to negate guilt*. And the investigator's affidavit certainly showed the possibility of mere forgetfulness, in the form of statements which minimized McGill's role in the preparation of the actual "guts" of the January 12, 2006 memo, i.e., the simple lists prepared by Smollar and then presumably transformed into spreadsheets by Thacker.

### D. Circumventing Protections Normally Afforded the Accused in Grand Jury Procedure

In *Backus, supra,* 23 Cal.3d 360, our Supreme Court took the unusual step of quoting with approval language from a long-vacated Court of Appeal opinion to make the point that a lack of fundamental fairness and due process *may* indeed invalidate a grand jury indictment. Said the *Backus* court: "In his opinion for the Court of Appeal, vacated by our grant of a hearing in *Johnson* v. *Superior Court*[, *supra*,] 15 Cal.3d 248 . . . , however, Justice Friedman held that the obligation of the prosecutor to assure independence, procedural regularity, and fairness in grand jury proceedings is compelled by due process: 'The grand jury's ability to safeguard accused persons against felony charges which it believes unfounded is an attribute of due process of law inherent in the grand jury proceeding; this attribute exists for the protection of persons accused of crime before the grand jury, which is to say that it is a "constitutional right;" *any prosecutorial manipulation which substantially impairs the grand jury's ability to reject charges which it may believe unfounded is an invasion of the defendant's constitutional right.* Although self-restraint and fairness may be the rule, unrestraint and unfairness the exception, *the inner core of due process must be effectively recognized when the exception occurs.* When the prosecutor manipulates the array of evidence to the point of depriving the grand jury of independence and impartiality, *the courts should not hesitate to vindicate the demands of due process.*' " (*Backus, supra,* 23 Cal.3d at p. 392, italics added.)

To be sure, the *Backus* court held, based on the facts in front of it, that due process had not been violated. (The introduction of certain hearsay in the case, which involved the indictment of narcotics officers for, essentially, supplying addicts with heroin in return for information about the addicts' suppliers, was held not to be prejudicial, and therefore did not violate the officers' right to due process. (See *Backus, supra,* 23 Cal.3d at pp. 393–396, and particularly p. 393.)) Even so, in *Backus* the Supreme Court had established that grand jury proceedings must be fundamentally fair, and that point has never been repudiated since.

Since *Backus* was decided, at least one Supreme Court opinion and two Court of Appeal decisions have emphasized that the "manner" by which a grand jury investigation is conducted may also invalidate a grand jury's indictment. (See *Cummiskey* v. *Superior Court* (1992) 3 Cal.4th 1018, 1022, fn. 1 [13 Cal.Rptr.2d 551, 839 P.2d 1059] (*Cummiskey*) [dicta approving idea that indictment might be set aside under a § 995 motion based on petitioner's "premise that the manner in which the prosecutor conducted the grand jury proceedings ran afoul of her due process rights under the relevant statutory

and common law principles governing indictment by grand juries"];[32] *Gnass, supra*, 101 Cal.App.4th at p. 1310 [noting that *Cummiskey* case had adopted the rule that the " 'manner in which the prosecutor conducted the grand jury proceedings' " could run "afoul" of " 'the relevant statutory and common law principles governing indictment by grand juries' "]; *Mouchaourab, supra*, 78 Cal.App.4th at pp. 424–425 ["In sum, California law provides that a defendant has a due process right not to be indicted in the absence of a determination of probable cause by a grand jury acting independently and impartially in its protective role. [Citations.] An indicted defendant is entitled to enforce this right through means of a challenge under section 995 to the probable cause determination underlying the indictment, *based on the nature and extent of the evidence and the manner in which the proceedings were conducted by the district attorney.* [Citations.]" (italics added)].)

In this case, we need not go so far as to invoke "due process" as a kind of brooding omnipresence in the sky to reach our conclusion. The Legislature has indeed provided protections which, had they been followed in this case, would have assured McGill fundamental fairness.

Chief among these protections is section 939.5, which is the requirement of a neutral grand jury. It is easy to glance over the text of the statute (aren't all juries supposed to be neutral?), but section 939.5 contains an important protection in the context of perjury charges: *"Before considering a charge against any person,* the foreman of the grand jury shall state to those present the matter to be considered and the person to be charged with an offense in

---

[32] In *Cummiskey*, a murder case, the court went on to conclude that there was no due process violation as against three challenges presented by the defendant. The high court rejected three arguments going to the conduct of the grand jury indictment. None of those points are applicable here.

First, the defendant in *Cummiskey* argued that it was improper for the prosecutor to instruct the grand jury that it could return an indictment on "sufficient cause" as distinct from tracking the "exact language" of section 939.8. The high court said no. It was proper. (See *Cummiskey, supra*, 3 Cal.4th at pp. 1025–1029.)

Second, the defendant argued that the prosecutor needed to tell the grand jury specifically to ask for its own witnesses "if it had doubts about" the defendant's guilt. (*Cummiskey, supra*, 3 Cal.4th at p. 1030.) That argument lost because the prosecutor never affirmatively told the grand jury that it *couldn't* "exercise its independent powers to hear additional, exculpatory evidence." (*Id.* at pp. 1033–1034.) We need only add that in the case before us the "even might" statements about the irrelevancy of Smollar's testimony, in contrast to the statements in *Cummiskey, were* affirmative deterrents to the grand jury's using its powers to hear additional, exculpatory evidence.

Third, the defendant argued that the prosecutor was required to instruct on lesser included offenses. That argument lost because of the long-standing California rule that there is no duty on the part of a prosecutor to instruct a grand jury on lesser included offenses. (See *Cummiskey, supra*, 3 Cal.4th at pp. 1034–1035.) (The defendant asserted that he might have committed the crime under the influence of LSD, and the grand jury, so the argument went, should have been told about the possibility of simply returning an indictment for voluntary manslaughter.)

connection therewith. He shall direct any member of the grand jury *who has a state of mind in reference to the case* or to either party which will prevent him from acting impartially and without prejudice to the substantial rights of the party to retire. Any violation of this section by the foreman or any member of the grand jury is punishable by the court as a contempt." (Italics added.)

The case before us involves the relatively rare situation where the *same* grand jury which heard the testimony from the nontarget witness which was allegedly perjurious *directly* indicts that nontarget witness for perjury. Indeed, commentators Vitiello and Kelso in their 2002 study of grand jury procedures alluded to this very problem, albeit in the context of their discussion of proposed rules involving the self-incrimination of witnesses. (See Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 575 ["Perhaps the harder question is what a prosecutor should do when the grand jury or prosecutor realizes, in the midst of that witness's testimony, that the witness may be subject to indictment."].)[33]

 But there's a structural problem with the scenario: When the same grand jury that heard the allegedly perjured testimony *directly* indicts the witness for perjury, the nontarget witness is effectively stripped of the normal protections otherwise built into the grand jury process. Primarily, the scenario directly violates section 939.5 because—*at the time when the grand jury considers the charge*—members of the grand jury necessarily *already* have a "state of mind" with reference to the charge in contravention of section 939.5.

Consider this hypothetical: Suppose a nondefendant witness testifies at a regular criminal trial, and the judge presiding over the trial comes to the conclusion that the witness has lied. Can the judge then *unilaterally* bind the witness over for a trial on the alleged perjury directly?

No. Obviously not. The case would have to be first referred to the local district attorney, who would then decide whether to proceed either by way of complaint-preliminary hearing-information or by way of grand jury indictment. Of course, as we have shown, if the district attorney decided to proceed by way of preliminary hearing, the accused witness would have the right to

---

[33] Vitiello and Kelso proposed that the prosecutor either "stop the inquiry and warn the witness, allowing the witness time to secure counsel," or, alternatively, making it very clear that prosecutors do "not have to provide warnings and a right to counsel." (Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 575.)

In the case before us, we must note that we do *not* reach our conclusion on a "self-incrimination" rationale. We do, observe, however, that there are sections of the current statutory scheme that do protect witnesses against self-incrimination. (Compare § 939.3 with § 1324.)

testify about the alleged false statements, and a neutral magistrate would have the power (to be sure, a limited power) to believe the witness and dismiss the case without the witness ever being required to stand trial.

But—alternately—if the district attorney elected to proceed by grand jury indictment, then the accused would have these protections:

First, *before* beginning the investigation—and that word "before" figures prominently in the text of section 939.5—the grand jury itself would have to be absolutely neutral and not be directly involved the case. It would not have any *preconceptions* as to whether the witness had knowingly lied as it easily would have if, as in the case before us, it had already heard the alleged perjurious testimony.

Second, the accused witness would have the right, under *Tyler*, to bring exculpatory evidence to the grand jury, even if the witness did not necessarily have a right to testify before the grand jury directly. The Supreme Court said in *Tyler*: "*Unquestionably, the fact of the existence of exculpatory evidence may be brought by any citizen to the attention of the grand jury in a regular way.* If such evidence exists, and they have reason to believe that it is within their reach, they may request it to be produced, and for that purpose may order the district attorney to issue process for the witnesses [citation], to the end that the citizen may be protected from the trouble, expense, and disgrace of being arraigned and tried in public on a criminal charge for which there is no sufficient cause." (*Tyler, supra*, 64 Cal. at p. 437, italics added.) For example, in the grand jury proceeding before us, the true "target" of the proceedings, Superintendent Fleming, was allowed to send a letter to the grand jury (in the words of the trial-level prosecutor instructing the grand jury at the conclusion of its proceedings) "a number of different documents and letters."

Third, since a grand jury would have been convened *specifically* to inquire into the case against our hypothetical witness-defendant, it would naturally be interested in key elements of perjury, including materiality and knowing falsehood. And so it is likely that an independent grand jury would want to inquire into the defendant-witness's state of mind, including calling witnesses who might be able to shed light on that state of mind. The prosecutor would further be obligated to instruct the grand jury specifically on the elements of perjury, including the element of knowing falsehood. (See *Berardi, supra*, 149 Cal.App.4th at pp. 498–499 [omission of instruction as to element of crime required dismissal of subsequent indictment].)

In the present case these basic protections were not afforded McGill. First, to reiterate, by having the very same grand jury indict McGill for perjury that

itself heard the alleged perjury in the context of an investigation of another, the prosecutor was effectively seeking an indictment from individuals who *already* had a "state of mind in reference to the case" because it was to *them* McGill had allegedly lied.

Second, nontarget witness McGill was effectively deprived of the protection to bring exculpatory evidence to the grand jury's attention which she otherwise would have had, under *Tyler,* if *she* had been the target. As noted, in this very case, Superintendent Fleming got the chance to present exculpatory evidence to the grand jury investigating *him.* But McGill never got that chance.

Finally, had McGill been the target of her own grand jury investigation, the grand jurors would have naturally *focused* on whether the elements of perjury were present in her case, including materiality and knowledge of falsity. As it was, McGill's indictment was indisputably an afterthought. In that regard, this record shows that the prosecutor's verbal instructions to the grand jury *did not mention* either the "materiality" or "knowing" element of perjury. We quote the entirety of the instructing prosecutor's oral instructions to the grand jury about McGill in the margin.[34] The prosecutor never mentioned either the "materiality" or "knowing" element of perjury. He simply told the grand jury, in practically these exact words: McGill lied to you, indict her.

In no way do we countenance the crime of perjury before the grand jury. We totally agree with Chief Justice Burger's words in *United States v. Mandujano* (1976) 425 U.S. 564, 576 [48 L.Ed.2d 212, 96 S.Ct. 1768]: "In this constitutional process of securing a witness' testimony, perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings."

But the California Legislature has built protections into the grand jury procedure that must be respected. In this case, another grand jury could have

---

[34] Here are those instructions: "The final count is count 4, and that's a perjury charge for Susan McGill alone. Susan McGill testified on two separate occasions here. She testified as the second witness on August 16th, 2006, and then came back the following week on August 21, 2006, and testified specifically about her trip to the registrar's office, the reason—or, as she stated, different reasons and different motivations for her going down there, but on several different occasions, both her own description and in answer to several questions by [the other prosecutor at the proceeding] and myself, she denied ever writing any names down, ever making any type of a list, ever taking down any written information, ever reporting anything in writing or orally to Dr. Fleming other than a brief description of the process of a recall. She, over the entire testimony over both days of testimony, perjured herself after taking the oath and denying any type of written report, any type of formal or informal reporting about the names of petition gatherers to Dr. Fleming. She was asked that type of questioning a number of different ways and denied it each time. Thus, the basis for the perjury."

been impaneled to examine whether McGill committed perjury before the grand jury that was investigating Fleming. (§ 904.6; see *Goldstein v. Superior Court* (2008) 45 Cal.4th 218, 227 [85 Cal.Rptr.3d 213, 195 P.3d 588] [" 'And finally, evidentiary materials gathered by one grand jury may be disclosed to a succeeding grand jury.' "].)

## E. *The Timeliness Issue*

While the arraignment took place on July 13, 2007, McGill's motion under section 995 to dismiss the charges against her was not filed until March 19, 2010. From this fact the district attorney's office now argues, pursuant to section 1510, that this court should not entertain McGill's writ challenge to the conspiracy charge. A similar argument was made in the context of the *Fleming* case. (See *Fleming, supra*, 191 Cal.App.4th at pp. 103–105.) As explained there, the 60-day time limit for appellate review of felony indictments pursuant to section 1510 has two exceptions: Lack of awareness of an issue, or lack of opportunity to raise that issue. (191 Cal.App.4th at p. 103.)

As explained in *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 950–951 [153 Cal.Rptr. 720], section 1510 operates at the *appellate* level: A defendant may make a section 995 motion at any time (and there would be a timeliness issue that would necessarily prevent the *trial court* from hearing it), but operates at the appellate level as a defense to the appellate court hearing the merits of a petition based on a section 995 motion. If raised as a defense, then the petitioning defendant "bears the burden of showing that he is within one exception or the other." (*Ghent*, at p. 951.) Moreover, as *Ghent* stated, the "stop-or-go question thus presented is whether the bar applies or one of the exceptions does, and the answer turns upon *a determination of fact to be made by the appellate court.*" (*Ghent, supra*, 90 Cal.App.3d at p. 951, italics added.)

The basic timeframes in this case are roughly the same as in *Fleming* (where this court found both unawareness and lack of opportunity), though there are a few differences between the two cases which merit mention: Unlike *Fleming*, Susan McGill's case is *not* one where the prosecution's legal theory is untenable as a matter of law. Perjury before the grand jury is a crime. A real crime. A school superintendent having subordinates compile a list of recall supporters in the context of all the facts in *Fleming* isn't. (See *Fleming, supra*, 191 Cal.App.4th at p. 104.)

On the other hand, the nature of the crime here—perjury—is extremely fact intensive in the sense that it is impossible to ascertain *what precisely* McGill said that was perjurious without going line-by-line through her

testimony, and, beyond that, all the other testimony that might have shown she was knowingly lying.

Given the fact-intensive nature of the charge, there is no way we could *fail* to find lack of opportunity given certain facts here. First, the district attorney's office here has only itself to blame for the fact that McGill's counsel would not be able to have even a rough idea of what issues might be raised in the context of a section 995 motion within 60 days of the arraignment. After all, the *indictment itself gave no details at all* about the alleged perjury. It merely alleged that somehow, somewhere in the grand jury proceeding, McGill had committed perjury. Indeed, even after several rounds of briefing in this writ proceeding, the district attorney's office has *yet* to actually quote the precise testimony that it asserts was perjurious. (The best it has done is its own paraphrase followed by a string of unadorned record references.) In the 60-day period after arraignment, McGill's counsel was thus left to *guess* what McGill said that got her into trouble.

Compounding the uncertainty created by the vague language of the indictment was a record that was uncommonly large. As recounted in *Fleming*, involving the same grand jury proceeding, the transcripts were "no less than five volumes" not counting exhibits that take up the better part of two volumes. (*Fleming, supra*, 191 Cal.App.4th at p. 104.) Given the sheer tediousness of the study required to truly understand the charge (in which regard, we apologize to our readers for the length of pt. III. of this opinion going into the details of McGill's, Thacker's, and other's testimony—but that was the sort of thing we ourselves needed to do to even understand the nature of the perjury charge), there is no way that McGill's counsel (a solo practitioner) could possibly have completed the job in 60 days. We stress: This case is different from the usual grand jury indictment, involving a discrete charge spelled out in the indictment and relatively manageable given the nature of a crime that is spelled out with reasonable particularity in the indictment. *This* case requires a great deal of mastery of a voluminous record before it even begins to make any sort of legal sense.

On top of that, it turned out that one vital bit of information—the investigator's affidavit—did not come to light until the spring of 2009, when it was turned over to the defense in the course of normal discovery.

We also find "unawareness" given the complexity of the issues. To understand the significance of the instruction declaring that anything Smollar even "might" say irrelevant requires not only a line-by-line review of McGill's and Thacker's testimony, but of related witnesses, particularly that of Fleming's secretary who corroborated the point that Smollar bore a grudge toward McGill (indeed, as it turned out, the whole district). And in that regard

the necessary research would extend beyond merely the proposition that prosecutorial awareness of directly exculpatory evidence would support a section 995 motion, but of the harder-to-find legal literature bearing on the overall *manner* which the law requires grand jury proceedings be conducted.

Finally, there is not a lot of case law discussing the fairness of the procedure as it played out in anything like the circumstances of this case— with the *same grand jury* that hears a witness deciding, based on a witness's testimony nine months previous, that that witness committed perjury, and without making any inquiry into the "knowing falsehood" element of perjury. The case law on perjury charges based on false testimony to a grand jury tends to focus on aspects of witness immunity and self-incrimination (see generally *United States v. Mandujano, supra*, 425 U.S. 564; *People v. Alcocer* (1991) 230 Cal.App.3d 406 [282 Cal.Rptr. 5]), but we have not been cited, nor have we found, any California authority that addresses the problem of the same grand jury directly indicting a nontarget witness in the same proceeding in which that witness has testified, and particularly nothing in the light of section 939.5's requirement of neutral grand juries. It would thus go without saying that McGill's counsel could not be expected to divine the full ramifications of that point within 60 days, given the voluminous record in this case.

We therefore find that both the lack of opportunity and lack of awareness exceptions to section 1510 are present here.

## VII. CONCLUSION AND DISPOSITION

### A. *The Writ*

A few concluding observations about the merits of the writ: The grand jury procedure, both in California and around the nation, has indeed been roundly criticized, not the least by a majority of our own Supreme Court in *Hawkins, supra*, 22 Cal.3d at pages 589–592. (See also Vitiello-Kelso article, *supra*, 35 Loyola L.A. L.Rev. at p. 514 [noting gratuitous destruction of political career of former Mayor of San Diego because topic of investigation became public even though no charges were ever brought]; see also *People v. McKinney* (1979) 95 Cal.App.3d 712, 743 [157 Cal.Rptr. 414] ["The functions of the grand jury as an indicting body have been under constant attack during recent years, the criticism culminating in *Hawkins* . . . ."].)

Our purpose here, however, is not to bury the grand jury procedure under an avalanche of criticism, but to praise the work of the Legislature in enacting statutes which ameliorate any potential for injustice. Those statutes

ensure that persons who, for example, may not be eligible for public counsel (and thus must pay for their own counsel out of their own pockets) need not endure " 'the trouble, expense, and disgrace of being arraigned and tried in public on a criminal charge for which there is no sufficient cause.' " (*Johnson, supra*, 15 Cal.3d at p. 254, quoting *Tyler, supra*, 64 Cal. at p. 437.) As the United States Supreme Court in *Hurtado* cautioned by way of historical review, grand jury procedure must not revert back to the point where to be indicted is to be practically convicted.

■ Our Legislature has provided protections against that sort of thing. Those protections were not, however, followed here. On the merits, the indictment against Susan McGill for perjury must therefore be dismissed. The petition for writ of mandate is granted. The trial court is directed to enter judgment dismissing count 4 against McGill.

### B. *Possible Sanctions*

Fairness is not a quality to be parsimoniously measured out in small spoons. The party who comes first often seems to have a compelling point, but a court needs to hear both sides of an issue before making up its mind. (Cf. Proverbs 18:17.) Fairness is recognizing that what, at first, seems to be an act of concealment might, if one hears the whole story, turn out to be innocent.

And so we determined to give the district attorney's office the same chance it never gave to McGill—the chance to explain what, on the surface, appeared to be a very damning case of concealing evidence, and why sanctions should not be imposed. (See generally *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1995) 37 Cal.App.4th 439 [43 Cal.Rptr.2d 757] [sanctions imposed in writ proceeding for bad faith arguments made by county's counsel]; see also Bus. & Prof. Code, § 6068, subd. (d) ["It is the duty of an attorney to do all of the following: [¶] . . . [¶] (d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."].)

But having received the district attorney's office's response, we now give a gentle answer. What *seemed* at first to be a case of bad faith turned out to be a simple case of legal error, *not* prosecutorial misconduct, and *not* appellate-level bad faith.

First, the appellate deputy prosecutor who had assured the court that his office was not aware of any exculpatory evidence from Smollar had confined himself, as most appellate lawyers do most of the time, strictly to the record before the trial court. He can hardly be faulted for that.[35] Indeed, the appellate deputy appears to have a valid point that McGill's attorney *was* tardy in bringing the investigator's affidavit to the attention of any court.

Second, both the appellate deputy and the trial deputies handling the grand jury investigation honestly thought that there was no need to disclose the investigator's recounting of Smollar's statements because, *on balance*, there was plenty of evidence that "negated" the possible innocent explanations of McGill's testimony.

In thinking that, they were, of course, in legal error. Under *Johnson*, and sections 939.7 and 939.71, the duty to turn over evidence reasonably tending to negate guilt to the grand jury does not depend on the prosecutor's estimation of the weight of the evidence, simply on whether the evidence reasonably tends to negate guilt.

But being wrong on the law does not mean one has acted in bad faith. (See *Flaherty, supra*, 31 Cal.3d at pp. 650–651 [the power to punish attorneys for prosecuting frivolous appeals "should be used most sparingly to deter only the most egregious conduct"].)

In the strict course of litigation, if merely being wrong were bad faith, no lawyer would have a moment's rest. The deputy prosecutors who handled this case certainly weren't the first lawyers to read the law—here, *Johnson*, *Hawkins*, and sections 939.7 and 939.71—in a way that favored their "client" and to see only their side of the case. Nor will they be the last. Seeing what we want to see can happen to the best to us. To paraphrase the poet (in this case Paul Simon), we would all do well not to forget that the case law is not legalese and jest, and a lawyer cannot read what he wants to read and disregard the rest.

---

[35] This court most certainly does *not* find, or believe, that the appellate deputy who has written the briefs in this court to be, as he fears we might in his declaration (see fn. 19, *ante*), "incompetent, willfully obtuse, or lazy." Nor do we find any bad faith. At all. At worst, he took too narrow a legal view of the nature of grand jury proceedings. His "sanction" will be merely to have to read this passage from *Johnson*: " 'The duty of the district attorney is not merely that of an advocate. His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial . . . .' " (*Johnson, supra*, 15 Cal.3d at p. 255, quoting *In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].)

There will be no sanctions based on the investigator's affidavit.

Rylaarsdam, J., and Moore, J., concurred.